In re Harvey H. SOBEL & Florence
N. Sobel, Debtors.

Silvio MONTALTO, Plaintiff,

v.

FLORENCE N. SOBEL, INC., Harvey H.
Sobel and Florence N. Sobel,
Defendants.

Bankruptcy No. 182–12757–21.

United States Bankruptcy Court,
E.D. New York.

Feb. 16, 1984.

Frederick Feder, Levy, Feder & Becker, P.C., Brooklyn, N.Y., for plaintiff.

Bruce Weiner, Horwitz & Associates, P.C., New York City, for debtors.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

These proceedings against the two debtors, Harvey H. Sobel and Florence N. Sobel, have as their purpose to establish the liability of the Sobels to the plaintiffs for compensatory and punitive damages due to fraud and the nondischargeability of these liabilities. With the consent of all sides, the action brought by Silvio Montalto was consolidated for all purposes with the suit brought by Steven and Josephine Zachofsky. Named as a defendant but never served is a corporation, Florence N. Sobel, Inc.

## THE PLEADINGS

Steven and 'Josephine Zachofsky claim that as a result of fraud perpetrated on them by the two debtors, they were induced to lend $10,000 to the corporation, Florence H. Sobel, Inc., of which the defendants are the officers and principal stockholders; that the money was never repaid; and that there is now due them the sum of $11,500 with interest. They seek repayment of that sum, plus $100,000 in punitive and exemplary damages. The defendants entered, in effect, a general denial, and an affirmative defense claiming that plaintiffs' dealings were two corporations, Florence N. Sobel, Inc. and Gentry Forwarding Co., so that the defendants have no personal liability for the monies advanced.

The complaint of Silvio Montalto alleges that as the result of the fraud practiced on him by the debtor, he was induced to pay them $25,000 as a partial payment for a 50% interest in Florence N. Sobel, Inc., coupled with a promise of employment; that the defendants have not repaid this money, as they agreed; that as a result, he has sustained damages in the amount of $25,700 which he seeks to recover, plus punitive and exemplary damages. Defendants have made the same answer to the complaint of Montalto as to the complaint of the Zachofskys.

Trial of this case took two days. Plaintiffs presented their case through their own testimony. At the conclusion of plaintiffs' case, the defendants moved to have the complaint dismissed for failure to prove a *prima facie* case, and the Court reserved decision. The defendants then called themselves as witnesses in their own defense. No one else testified. The Court requested proposed findings, which have been received from the plaintiffs alone.

## FINDINGS OF FACT

The debtors, Harvey H. and Florence N. Sobel, were engaged for twenty-five years in the trucking business. In 1975 the business, which they had been carrying on in

the name of Spartan Forwarding & Gentry Forwarding Company, was incorporated under the name of Florence N. Sobel, Inc. ("Sobel, Inc."). (II 3).[1] Mr. Sobel was the President of Sobel, Inc. and his wife, who held all its stock, was Chairman of the Board (II 5). The Sobels claim that Mrs. Sobel performed various financial and recordkeeping functions for Sobel, Inc. at 272 Exeter Street, which was also the Sobel's marital residence (II 5). The balance of the business was carried on at a terminal at 3445 Paterson Plank Road, North Bergen, New Jersey (II 4).

For many years Mr. and Mrs. Sobel lived a life of affluence. At their home they employed, at one time, a chauffeur-butler, a full-time maid, two full-time nurses for Mrs. Sobel's mother, plus a private hairdresser periodically: all of whom were paid in excess of $55,000 per year in cash plus room and board. (II 10, 69–71). Mr. Sobel owned two Cadillac cars, including a chauffeur-driven limousine given to him by his wife in 1977. (I 61, II 8–9).

Sobel, Inc. prospered for many years. In each of the fiscal years ending August 1, 1979 and August 1, 1980, it grossed more than one million dollars (P.Ex. 1, II 62).

Around May or June, 1980 the business began running into severe financial difficulty (II 16, 62–63). It lost many major accounts and was adversely affected by the deregulation of the trucking industry. (II 16, 63). There apparently were difficulties with Mr. Sobel's son and Mrs. Sobel had serious health problems. (II 16–17, 110–111).

In December, 1980, Mr. Sobel placed a $75,000 second mortgage on his Brooklyn home, turning all the money over to Sobel, Inc. to pay its debts. (II 17–18, 66–67). In addition, between October 1980 and June 1981, Sobel made some $75,000 in cash available to the corporation from money kept in a drawer in his home. (I 71). Despite these measures the corporation lost money steadily to the point where Mr. Sobel

said he was "ready to cut [his] throat." (II 60).

In January, 1981 Mr. Sobel claims he sustained a loss of almost $780,000 (II 61). In that month, volume went from "over a million dollars to nothing." "[He] lost everything. [He] had to restart a business and [he] tried to build it up as a one-man business." (II 61). In February he discharged all his New Jersey personnel including his son and his manager and reduced his household help to one maid who agreed to work for $150.00 a week. (II 23).

During the period, August 31, 1980 to January 31, 1981, following the close of the 1980 fiscal year, the business failed to cover its expenses. (II 68).

Sometime in early 1981 Josephine Montalto, the wife of the plaintiff, Silvio Montalto, began doing Mrs. Sobel's hair in the latter's home. Josephine Montalto owed her employment by Mrs. Sobel to her husband's sister, the plaintiff, Josephine Zachofsky. (I 14). In 1974, Josephine Zachofsky had been employed by Mrs. Sobel in the same capacity. (I 11). As a result a close friendship had grown up between Mrs. Sobel and Mrs. Zachofsky and between the two couples. (I 11–12). Mr. and Mrs. Zachofsky had been entertained repeatedly at Christmas parties given by the Sobels and on one occasion had been taken out to dinner in a nightclub; Mr. Sobel had helped patch up marital difficulties between Mr. and Mrs. Zachofsky; and Mr. and Mrs. Sobel had been named as godparents to one of the Zachofsky's children. (I 12–13, 25–27, 60, II 10–13).

In the Sobel home, Mrs. Sobel had seen elaborate gifts and furniture bought by Mr. Sobel, including a gold watch and chain, beautiful jewelry, grandfather clocks, of which one was a collector's item, and gold collection plates. (I 14).

In June, 1981 Josephine Montalto overheard Mrs. Sobel saying, during the course of a telephone conversation, that her hus-

---

1. "I" refers to the transcript dated July 20, 1983 and the numbers which follow to the pages of that transcript.

"II" refers to the transcript dated July 22, 1983.

band was looking for a partner because the business was too big for one man to handle. (I 15). Mrs. Montalto told her husband, Silvio, a 28-year-old immigrant from Italy, then making less than $300.00 a week as a dental technician, what she had overheard. (I 35–37). He discussed the news with their brother-in-law, the plaintiff Steven Zachofsky, who was employed as a court reporter. (I 38, 59–60).

As a result a number of meetings took place involving Mr. and Mrs. Sobel, Mr. and Mrs. Montalto, Mr. and Mrs. Zachofsky. The witnesses disagree respecting what took place at these meetings, but the Court is accepting as true the testimony of the plaintiffs, rather than of the defendants, both because it is more consistent with the other facts and because of the poor opinion the Court formed of Mr. Sobel's credibility.

At the first meeting which took place, Mr. and Mrs. Sobel told the others that Sobel, Inc. was a very prosperous and booming business (I 62). Both identified all their wealth as originating with the business. (I 17–18, II 115). After identifying the large companies with which the firm was doing business, Mr. Sobel told them that his trucking business "was a very good business and [he] was making a lot of money, over a million dollars." (I 39). He showed them "papers that [he] was making for '77, more than a million dollars, '78, more than a million dollars, '79, more than a million dollars." *Ibid.* He handed around copies of the financial statement prepared by Feldman, Feldman & Co. for the fiscal years ending August 31, 1979 and 1980, showing gross income in both years in excess of over one million dollars. (Px. 1). He told them that business "was better now than it was before." (I 39).

The reason he gave for needing a partner was that "he could not run the business by himself. He needed help. He needed somebody that he can trust, that he could train and help him in the business. He cannot handle by himself. He needs help." (II 115. See, also, I 18, 38, 62).

Mr. Sobel offered to sell Mr. Montalto fifty percent interest in the business for $125,000, explaining that he valued the business at $250,000. (I 46, 63, II 27–28). When Mr. Montalto said he had no more than $25,000, Mr. Sobel suggested Mr. Zachofsky put in some money as well. (II 27).

What ultimately took place was that Mr. Montalto gave Mr. Sobel a bank draft for twenty-five thousand dollars, and Mr. Zachofsky gave him one for $10,000, both made out to Sobel, Inc. and deposited in the corporation's bank account from which the monies were withdrawn to pay the corporation's expenses. (II 30).

The money paid by Mr. Montalto was a part payment for a half interest in Sobel, Inc., represented by 20 shares of the stock. The balance due, $100,000, was to be paid by deducting $200.00 a week from the $500.00 weekly salary which Mr. Montalto was to receive thereafter as an employee of Sobel, Inc. A contract embodying these terms was executed by Sylvia Montalto and Sobel, Inc. (D.Ex.A.). This contract was prepared by a neighbor of Mr. Sobel (II 25–27) and provided in part:

"7. No representations other than as may appear in this agreement have been made by or on behalf of the Seller.

8. Buyer has examined the books and records of the Seller and knows the contents thereof. He has also been given free rein to observe the operation of Seller's business and has been allowed unimpeded access thereto.

9. This agreement is being drawn by Seller's lawyer. Buyer has been advised to consult a lawyer and/or accountant of his choice before signing this contract." (D.Ex.A.; II 42).

In fact, Mr. Montalto had never examined the books and records of the Seller and while he had been taken out to New Jersey, it had been on the weekend when no business was in progress. (II 44–46, 119).

No written document was prepared respecting the agreement between Mr. Zachofsky and Mr. Sobel to the effect that the former was to receive fifteen percent on his money annually with the option of demanding its return at any time. (II 86–88, 90).

784

Mr. Montalto worked for Sobel, Inc. for ten weeks before he was asked to leave. (II 34–35). In 1981, the Sobels and Montalto had another meeting and it was agreed that Mr. Montalto would receive back the money he had invested. For thirteen weeks he was paid $100.00 and nothing since that date. (I 46). The Zachofskys have been repaid no part of their $10,000. (I 21).

In March, 1982, after the Marshall had levied on the property of Sobel, Inc., it closed its doors. (II 36–37, 92). In November, 1982, the Sobels filed personally for bankruptcy. (II 36).

Mr. Sobel claims that all the records of Sobel, Inc., except those maintained by his factor, were lost when the New Jersey premises were closed by the Marshall. (II 48, 51–52, 84–85). He and his wife deny having any checkbooks, receipts, or any other documents with respect to Sobel, Inc. (II 49–51, 106–111).

When Mr. Sobel was asked what had happened to a Patek Phillipe watch with a value of $5,000.00 or more, he replied:
"A. I sold it in around, I think September, October 1980.
Q. To who?
A. I sold it on the street for anything I could get. On 47th Street.
Q. Do you know the name of the man you sold it to?
A. He had a long beard and gave me the money and I walked away.
Q. How much did you get for it, sir?
A. I got $3,500.
Q. You knew this man, before that date?
A. No. I saw him on the street, he had the cash, and I gave him the watch." (II 73).

With respect to fifty gold ingots for which he had paid $37 apiece, he said he sold the entire collection for $50.00 to "A colored guy" on Sheepshead Bay Road. (II 74). Asked if he knew the man's name, he replied, "No. His name was 'Cash'. That is what he gave me. And I gave him the box." (II 74).

Regarding an expensive grandfather's clock, he testified that it had been sold in late 1981 to a furniture dealer. Asked the dealer's name, he replied, "I really don't know his name. I advertised things for sale. The guy came in and gave me cash. He took the clock and then we had money to eat." (II 75). Asked where this man's office was, he responded, "I really don't know. He came down with a station wagon and took the clock." Ibid.

█ As these flippant, evasive replies show, Mr. Sobel's testimony is of no probative value and is entitled to no credence since it is evident from his demeanor and the nature of his responses that he felt no obligation to tell the truth. No one familiar with New York could believe that persons frequent 47th Street with $3,500 cash on their person ready to exchange it for a watch offered by a total stranger, encountered by accident on that thoroughfare.

Mr. Montalto and Mr. and Mrs. Zachofsky relied on what Mr. and Mrs. Sobel told them about how good the business of Sobel, Inc. was when they invested their money. (II 116, 120). They were also influenced to do so by the trust they placed in Mr. and Mrs. Sobel. Ibid.

## DISCUSSION

The Bankruptcy Code excepts from discharge any debt "for obtaining money, property, services, or an extension, renewal, or a refinance of credit, by—(A) false pretenses, a false representation, or actual fraud * * *." 11 U.S.C. § 523(a)(2)(A). This section is not identical with the parallel exceptions in the Bankruptcy Act, but the differences are irrelevant to the facts of this case.

Section 17(a)(2) of the Bankruptcy Act (former 11 U.S.C. § 35a(2)) excepted from discharge "liabilities for obtaining money or property by false pretenses or false representations." Other types of fraud were excepted from discharge only where the debtor was "acting as an officer or in any fiduciary capacity." Former 11 U.S.C. § 35a(4). Since this is a case involving

false representation, the decisions under the Act are pertinent.

11 U.S.C. § 523(a)(2)(A) and its statutory predecessor are exhaustively analyzed in the decision by Bankruptcy Judge Price in *In re Newmark,* 20 B.R. 842 (Bkrtcy.E.D.N. Y.1982). As Judge Price noted there, a creditor invoking this section to block the dischargeability of a debtor must prove the following:

"(1) [T]he debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made." *In re Newmark, supra,* 20 B.R. at 853–54 quoting *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 543 (W.D.Va.1967).

See also *In re Nelson,* 561 F.2d 1342, 1346 (9th Cir.1977); *In re DeRosa,* 20 B.R. 307, 311 (Bkrtcy.S.D.N.Y.1982).

■ The creditor carries the burden of proof; his evidence must be clear and convincing; exceptions to discharge are to be strictly construed. *In re Newmark, supra,* at 20 B.R. 852–853 and cases there cited.

■ The facts here meet the most stringent requirements. When the Sobels induced their trusting friends to invest their savings in Sobel, Inc., they knew the business which one year earlier had grossed one million dollars annually was losing money steadily; that in February, 1981 its gross volume had dropped away to a fraction of what it had been; that in order to keep the business afloat the Sobels had mortgaged their home and sunk more than $150,000 into the business in less than a year. The business was losing so much money that Sobel was, in his own words, ready to "cut [his] throat".

Therefore, when Sobel showed the Zachofskys and Montaltos the financial statement for the two fiscal years preceding the precipitous decline of Sobel, Inc., reflecting a gross of a million dollars a year, and told them business "was better now than it was before," he was lying. And he compounded his falsity by a misleading display of figures. As Sobel well knew, it was not true that business was better than before. In fact, it had never been worse.

The Sobels' purpose in misrepresenting the profitability of their company was to induce the Zachofskys and Montaltos to part with their money. They intended to deceive the plaintiffs with respect to the profitability of Sobel, Inc. In this they were successful. That the Zachofskys and Montaltos relied on the picture given them is as uncontrovertible, as is the loss they suffered thereby.

■ That the Zachofskys and Montaltos may have been particularly easy dupes, that more experienced investors might have made a closer investigation of the facts before parting with their money is of no consequence. To decide this case it is not necessary to decide whether creditors invoking Section 523(a)(2)(A) to block a discharge must show "reasonable reliance", as is required of a creditor relying on Section 523(a)(2)(B) Cf. *In re Granovetter,* 29 B.R. 631, 640–641 (Bkrtcy.E.D.N.Y.1983).

■ In the circumstances present here the plaintiffs' reliance on what was told them by the Sobels was not unreasonable. Because of the relationship of trust and confidence which had been built up between the younger people and the Sobels, it was easy for the former to credit Sobel's explanation that he was bringing Montalto into the business because he needed assistance and wanted someone he could trust. They are not to be faulted if they believed that their close friends and the godparents of one of their children would deal honestly with them.

■ If, in fact, it were necessary to the decision in this case, this Court would hold that it is no part of the burden of a creditor who has been successfully deceived by fraud (through means other than a false representation in writing) to show that his reliance on the debtor's false statements was reasonable. We agree with the Seventh Circuit

that the law "was meant to discharge only the *honest* debtor from his debts . . . and that the [Code] should be liberally applied to protect the bankrupt only in those cases where there is no intent to violate its provisions." *Matter of Garman,* 643 F.2d 1252, 1257 (7th Cir.1980) (Citations omitted. Emphasis in original). There is no reason why bankruptcy should depart from the general rule that the law protects the credulous and trusting as well as the sophisticated and skeptical. It is no excuse for a culpable misrepresentation that means of probing it were at hand. *Albert v. Title Guarantee & Trust Co.,* 277 N.Y. 421, 423, 14 N.E.2d 625 (1938).

■ It is also of no significance that the misrepresentations made were not the single reason for the investments made and that the Montaltos and Zachofskys may have also been influenced by the trust they placed in the Sobels and by the material wealth the Sobels displayed. As long as fraudulent misrepresentation is a material cause, it need not be the only factor for the resulting debt to be nondischargeable. *In re Rodriguez,* 29 B.R. 537, 540 (Bkrtcy.E.D. N.Y.1983); *In re Clancy,* 279 F.Supp. 820, 822 (D.Colo.1968), *aff'd,* 408 F.2d 899 (10th Cir.1969), *cert. denied,* 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969).

■ Equally, it is of no consequence that the money ostensibly went to Sobel, Inc. rather than to the defendants personally. Nothing is more commonplace than for the owners of a small closely-held corporation, like Sobel, Inc., to engage in fraud for the benefit of the corporation rather than for themselves directly. That a corporation is the beneficiary does not make the fraud any less. E.g., *Mack v. Latta,* 178 N.Y. 525, 82 N.Y.S. 130, 71 N.E. 97 (1904); *Bailey v. Diamond International Corp.,* 47 A.D.2d 363, 367 N.Y.S.2d 107 (3d Dept.1975); 24 N.Y.Jur., Fraud and Deceit, § 208–210 at 284–287 (1962); 3 *Collier on Bankruptcy,* ¶ 523.08[1] at 523–36 (15th Ed.1983).

■ Finally, the exculpatory language in the contract with Montalto will not insulate the fraud from examination. *Centronics*

*Financial Corp. v. El Conquistador Hotel Corp.,* 573 F.2d 779, 782 (2d Cir.1978); 24 N.Y.Juris., Fraud and Deceit, § 236 (1962).

■ The $25,000 given the Sobels by Montalto and the $10,000 given by Mr. Zachofsky were the fruit of fraud. The plaintiffs have suffered damages in these amounts and they are entitled to judgment against the defendants for the monies turned over to them. Their damages do not stop with the loss of their money, they are also asking interest. In this adversary proceeding the Court is not only determining whether or not a debt is dischargeable, it is also fixing the amount of such debt. There can be no question but that at common law the damages for the deprivation of the use of property because of fraud includes interest beginning with the date of such deprivation, in this case, July 1981. Cf. *Flamm v. Nobel,* 296 N.Y. 262, 72 N.E.2d 886, (1947), 13 N.Y.Jur., Damages, § 134. That being the case, interest should also be due if the debt is nondischargeable. While the issue is not wholly free from doubt, to this Court there seems to be no reason why pre- and post-petition interest on a nondischargeable private liability should be in a different, or worse, position than post-petition interest on a nondischargeable tax liability which the Supreme Court has held remains the debtor's personal liability. *Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964). Therefore, the plaintiffs are entitled to judgments for the amount of their losses plus interest at the legal rates since July, 1981.

■ The Court is not awarding exemplary or punitive damages. The Sobels no doubt deceived the plaintiffs but they were also deceiving themselves. Their own money was lost together with that of the plaintiffs. This does not seem the occasion to require the payment of anything more than actual damages, even if it were clear that the Court has the power to do so. Cf. *The Record Co.,* 8 B.R. 57, 60 (Bkrtcy.S.D.Indiana 1981).

Since the payments to which the plaintiffs are entitled are predicated on fraud they are not dischargeable in bankruptcy.

They will be excluded from the debts from which the Sobels are discharged.

During the trial and in the proposed findings the plaintiffs indicated that they might also be seeking to block the Sobels' rights to any discharge pursuant to 11 U.S.C. Section 727 which authorizes the court to deny a discharge to a debtor where he has concealed property or has concealed or failed to keep records from which his financial condition or business transactions might be ascertained. 11 U.S.C. § 727(a)(2). No notice, however, was given in the pleadings that the plaintiffs were going to oppose any discharge for the Sobels on these grounds and no motion was made to conform the pleadings to the proof. Therefore, the Court is not reaching the question of whether a discharge should be denied, not simply as to the plaintiffs' debts but as to all debts because of concealment of property and the failure to keep records.

The motion to dismiss at the close of the plaintiffs' case is denied.

Settle judgment on notice.