In re Robert A. DISHAW, Debtor.

**UNITED VIRGINIA BANK, et al., Plaintiffs,**

**v.**

**Robert A. DISHAW, Defendant.**

**Bankruptcy No. 84–00815–A.**
**Adv. No. 84–0401–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Sept. 23, 1987.

David S. Klontz, Lalos, Leeds, Keegan, Marsh, Bentzen and Kaye, Washington, D.C., for Max L. Guthrie.

Richard E. Henning, Jr., Buonassissi, Henning, Campbell & Moffet, P.C., Fairfax, Va., for United Virginia Bank.

Daniel L. Robey, Matthews & Robey, Ltd., Falls Church, Va., for debtor.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

These matters arise upon each plaintiff's allegation that the debt owed him by the debtor, Robert A. Dishaw ("Dishaw") is nondischargeable under various provisions of the Bankruptcy Reform Act of 1978 11 U.S.C. §§ 101–151326 ("the Code"). Plaintiff Max L. Guthrie ("Guthrie") bases his claim of nondischargeability on sections 523(a)(2)(A) and (B) of the Code, while United Virginia Bank ("UVB") argues its nondischargeability claim only under section 523(a)(2)(B). UVB also urges the Court to deny the debtor a discharge under section 727(a)(2), (3), and (5). Because Guthrie and UVB filed a single complaint for determination of dischargeability, the Court heard these largely unrelated causes of action in a single trial.

*Guthrie's Claims*

The debt owed Guthrie arose in the course of negotiations regarding a possible investment in Breton Bay Yachts, Inc. ("BBY"), a corporation of which the debtor was president. When Guthrie expressed an interest in the enterprise, Dishaw submitted for his consideration the most recent corporate financial statements (an income statement and a balance sheet), a prospective balance sheet, and a development plan. Guthrie obtained an accountant's opinion on the documents and, consequently, requested revised financial statements that had been both reviewed or audited and prepared using uniform accounting practices.

While he awaited delivery of the reviewed financial statements, Guthrie toured the BBY facilities with Dishaw, and the two continued to negotiate the terms of the investment proposal. In the course of these discussions, the parties developed a plan under which BBY could obtain the capital it needed, and Guthrie would have the additional time he required to make an investment decision. Under the terms of the "Option Contract" signed by the parties, Guthrie was to "lend" BBY $100,000.00. If after his review of the new financial statements Guthrie wished to proceed with an investment in the venture, the sum would be applied to his stock purchase. If Guthrie decided against an investment in BBY, the company would repay the sum with interest accruing from the date of Guthrie's refusal to invest. Guthrie's loan was secured by BBY stock held by Dishaw, and by Dishaw's personal guaranty of payment. When, after Guthrie declined to invest in the enterprise, BBY and Dishaw defaulted on the loan payments and Dishaw filed a petition for relief under Chapter 7, Guthrie brought this claim of nondischargeability.

Guthrie asserts that during his negotiations with Dishaw the debtor made numerous false representations which persuaded Guthrie to make the $100,000.00 loan to BBY. It is Guthrie's position that these falsehoods render Dishaw's debt to Guthrie nondischargeable under section 523(a)(2)(A). Further, Dishaw memorialized many of the false statements in the writings which document the loan transaction. Guthrie asserts that the loan documents, as well as the financial statement and balance sheet, are statements of financial condition as defined in subsection (a)(2)(B) of section 523, and cites that section as an independent alternative ground for exception of this debt from discharge.

*The Promissory Note*

The promissory note which memorializes Guthrie's $100,000.00 loan to BBY, dated March 3, 1983, and signed by Dishaw in both his capacity as president of BBY and

as personal guarantor of the company's indebtedness, includes the following recitation:

> As collateral for the payment of this note, Robert A. Dishaw agrees to pledge his stock in Breton Bay Yachts, Inc., consisting of 135 shares, to Max Guthrie, to be held in escrow.

Dishaw admitted at trial that on February 28, 1983, three days prior to signing the promissory note, he signed a loan agreement and a Deed of Trust in favor of Atlantic Investments, Inc. As security for Atlantic Investments' $77,500.00 loan to BBY, Dishaw executed a personal guaranty of payment, granted the lender a Second Deed of Trust on his home and on property owned by BBY, assigned the lender all his personal commission income and all BBY receivables and, most importantly, pledged his 135 shares of BBY stock.

Because Dishaw had previously pledged the stock, Guthrie claims, Dishaw's representation that the stock would stand as security for Guthrie's loan was patently false. Guthrie also questions Dishaw's ownership of and capacity to pledge the entire 135 shares, a contention we discuss below.

*The Option Contract*

The Option Contract for the Sale of Stock and Partnership Interest ("Option Contract"), signed contemporaneously with the Promissory note memorializing Guthrie's loan, contained the following caption below Dishaw's signature: "President and Sole Shareholder of Breton Bay Yachts, Inc." Dishaw acknowledged at trial that the caption was in place when he signed the document, and that he was not the sole shareholder of BBY stock.

Dishaw testified that he owned 100 of the 135 outstanding shares of BBY stock as community property with his wife.[1] The remaining 35 shares were held by one Dave Roberts. Dishaw claimed, however, that Mr. Roberts granted him the power to pledge as collateral all 135 shares of stock. This purported agreement between Mr. Roberts and Dishaw was not in writing, and Dishaw offered no evidence except his own testimony regarding the agreement. Dishaw testified that the stock was issued in Mr. Roberts' name and was delivered to him, facts which Guthrie asserts undercut Dishaw's claim that Dishaw held the power to pledge Robert's stock.

Further, Guthrie challenges the truth of Dishaw's assertion, memorialized in the Option Contract, that he owned a one-third interest in a land development enterprise. The Option Contract states as a term of the investment transaction Dishaw's covenant to transfer to Guthrie

> one half of Dishaw's one third ($\frac{1}{3}$) partnership interest in Cherry Cove Land Development, together with the right to acquire one (1) lot of the initial fifty (50) lots offered by Cherry Cove Land Development ["CCLD"].

Dishaw's assertion of ownership of thirty-three percent of CCLD also appears on a separate document listing "considerations" that Dishaw would provide Guthrie in exchange for an investment of $250,000.00. Guthrie testified that Dishaw gave him the signed list, together with a proposed Contract for the Sale of Stock, early in the negotiations process.

When Guthrie toured the BBY facilities, he also viewed the land which, Dishaw represented, CCLD proposed to develop as a residential subdivision. According to Guthrie's testimony, Dishaw indicated the gen-

---

1. The ownership of these 100 shares remains unclear. Dishaw claimed to own only fifty shares of BBY's 1982 U.S. Corporation Income Tax Return. Dishaw testified that although his wife "jointly owned" the 100 shares of stock her name did not appear on the stock certificates. John Parker Bailey, an accountant who prepared tax returns for Dishaw and for BBY, testified that he understood, on the basis of information from Dishaw, that the debtor and his wife each owned fifty shares of BBY stock, and prepared the BBY return accordingly. When he disclosed a $487,334.00 stock loss on Dishaw's 1983 U.S. Individual Income Tax Return however, Bailey listed Dishaw's BBY stock ownership at 1000 shares. Bailey testified that he based that figure on the company's Articles of Incorporation, which noted that 1000 shares were issued to Dishaw. The parties have not submitted the Articles of Incorporation to the Court.

eral waterfront area as the portion from which the CCLD owners would select their lots.

Dishaw admitted at trial that he at no time owned any interest whatsoever in CCLD.

*The Financial Statements*

Guthrie also alleges that the BBY financial statements given him at the outset of his negotiations with Dishaw were materially false. Guthrie compares the figures noted on the financial statement with those on the corporation's tax return for the same period, and concludes that the financial statement is false. The gross income figure on BBY's 1982 tax return is $132,632.00; the corresponding figure on the financial statement given Guthrie (titled Income Statement for Third Quarter), is $446,660.00. The tax return showed a net loss for the year 1982 of $43,535.00; the financial statement showed a net profit for the third quarter of 1982 of $49,603.00.

The tax return Guthrie points to, however, includes the following qualifier:

During 1983 and 1984 certain managers took various records for storage. The records have not as yet been found. This tax return is based on the records available.... The corporation has lost many of the records concerning notes payable and intends to file an amended return when all information is received.

It was uncontroverted that when the 1982 corporate tax return was prepared in 1985, the company's records were seriously incomplete.

*False Oral Representations*

Guthrie alleges that Dishaw made verbal assertions and promises of the same nature as each of the false statements contained in the transaction documents. In addition, Dishaw informed Guthrie that BBY had received approval for a loan from the Small Business Administration ("SBA"). Guthrie's handwritten contemporaneous notes of a conversation with Dishaw contain the entry "SBA Loan pays off 1st", lending credence to Guthrie's claim that Dishaw characterized the loan as already approved. Dishaw testified that he had several conversations with the regional SBA office in Norfolk, Virginia, which culminated in the agency's representative stating that the SBA would not approve a loan to BBY.

*Elements of a Nondischargeability Claim under Section 523(a)(2)(B)*

Because nearly every representation at issue appears in a written document, the most appropriate section under which to consider this claim is the false financial statement exception to discharge codified in section 523(a)(2)(B). 11 U.S.C. § 523(a)(2)(B). Under that section, the Court must find nondischargeable any debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

... (B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with an intent to deceive.

11 U.S.C. § 523(a)(2)(B).

The accepted elements of a creditor's claim of nondischargeability were set forth by the United States District Court for the Western District of Virginia in *Sweet v. Ritter Finance*, 263 F.Supp. 540 (W.D.Va. 1967):

(1) [T]he debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

263 F.Supp. at 543. A creditor asserting nondischargeability of a debt must present clear and convincing evidence in support of each element of his claim. *In re Newmark*, 20 B.R. 842, 853 (Bankr.E.D.N.Y. 1982) (citing numerous cases).

In view of the debtor's admissions that he was not the sole shareholder of BBY, that he owned no interest in CCLD, and that he signed a stock pledge to Atlantic Investments three days before pledging the identical stock as collateral for Guthrie's funds, no serious question exists that the loan documents in evidence were materially false.

■ Dishaw promised as consideration property he did not own, and offered as unencumbered collateral stocks which had been pledged to a corporate lender. Courts have consistently found that a debtor who pledges as collateral an item he does not own has made a false representation sufficient to except the debt from discharge under section 523(a)(2). *See Birmingham Trust National Bank v. Case*, 755 F.2d 1474 (11th Cir.1985); *In re Easterly*, 11 B.R. 206 (Bankr.E.D.Tenn.1981); *In re McGillis*, 40 F.2d 268 (10th Cir.1930). *See also In re Eaton*, 41 B.R. 800 (Bankr.E.D. Wis.1984) (although debtor made a false representation when he pledged as collateral for a loan several diamonds which were gifts to his wife and daughter, the fact that the lending bank did not reasonably rely on the misrepresentation allows the court to discharge the debt).

The United States Bankruptcy Court for the Southern District of Ohio ruled in *In re Madore*, 41 B.R. 282 (Bankr.S.D.Ohio 1984) that the holding out of an encumbered asset as unencumbered and suitable for use as collateral was a false representation within the purview of section 523(a)(2). The debtor in *Madore* purchased an automobile in Canada with funds loaned by a Canadian creditor. The Canadian creditor took back a security interest in the vehicle, although no such interest was noted on the Certificate of Title issued at Ontario, Canada. The debtor presented the unencumbered Canadian title in the State of Ohio, and received a clear Ohio title to the auto. The debtor then used the unencumbered title document to persuade a U.S. creditor to accept the car as collateral for a loan.

In finding the debt to the U.S. creditor nondischargeable, the *Madore* court noted that

[t]he failure of the defendant to inform the plaintiff of the [prior] lien was, in effect, a false representation upon which the plaintiff reasonably relied and sustained loss and damage as a result.

41 B.R. at 284.

In the matter before this Court, Dishaw admitted that he never owned an interest in CCLD. His promise to transfer to Guthrie one half of his interest in CCLD in exchange for Guthrie's investment in BBY was, therefore, patently false. Under the case law previously cited, this misrepresentation is sufficient to satisfy the plaintiffs burden under section 523(a)(2)(B)(i).

Further, Dishaw promised to pledge his 100 shares of stock in BBY as collateral in the transaction with Guthrie. It seems likely that Dishaw did not himself own 100 shares in BBY, but owned a total of 100 shares with his wife. Regardless of the possible false representation regarding ownership of the stock, Dishaw's stock pledge rests on an implied assertion that the stock was not already pledged as security for another debt. *See Madore*, 41 B.R. at 284. It is undisputed that Dishaw signed on February 28, 1983, only days before he obtained the loan at issue here, an agreement with Atlantic Investments under which Dishaw pledged his stock in BBY as security for an $80,000.00 loan. Under the rule of the *Madore* case, this misrepresentation is also a false statement within section 523(a)(2)(B)(i).

The falsity of the financial statement and balance sheet for BBY is less clear, because the tax return with which Guthrie compares these documents reveals that the corporate tax return was, of necessity, prepared without all the relevant records and information, thus leaving a substantial margin for error. Further the 1982 corporate return was not prepared in the spring of 1983 but in the winter of 1985 and was therefore not even roughly contemporaneous with the documents, dated September 30, 1982, which Guthrie contends are false. Consequently, the Court cannot infer from the tax return alone that financial documents were false or that Dishaw knew them to be so. No significant conclusion

can be drawn solely from the disparity in figures revealed by the plaintiff.

However, some of the debtor's testimony also bears upon the accuracy of the BBY financial documents. Dishaw testified that the financing arrangement under which BBY maintained an inventory of yachts was terminated in December of 1982 or January of 1983, that before the termination BBY's inventory creditor required additional security which Dishaw provided in the form of a second trust on his residence and a pledge of 135 shares of BBY stock, that Dishaw acquired the cash needed to fulfill the termination of the agreement by executing a 90–day note, for which even more extensive security was required, at an annual percentage interest rate of over 104%, and that in March and April of 1983 Dishaw made additional personal investments in BBY totalling $170,000.00 to keep the company operating. These circumstances, particularly when considered in conjunction with the tax return showing a $43,535.00 loss for 1982, invite the conclusion that even if the financial statement dated September 30, 1982 was accurate on that date, subsequent events not revealed to Mr. Guthrie made the documents inaccurate when delivered for his consideration in the winter of 1983. The relevant facts, taken together, are clear and convincing evidence that the financial documents, the Option Contract, and the promissory note were materially false statements respecting Dishaw and BBY.

In view of the numerous and blatant inaccuracies, the conclusion is inescapable that Dishaw drafted the several documents which falsely represent his financial condition and the financial condition of BBY with an intent to deceive. *See In re Kimzey*, 761 F.2d 421, 424 (7th Cir.1985) (Court may infer intent to deceive from false representations which the debtor knows or should know will induce creditor to lend); *In re Clark*, 1 B.R. 614, 617 (Bankr.M.D. Fla.1979) (Court may infer intent to deceive from totality of circumstances creating a picture of deception) *See also In re Schlickmann*, 6 B.R. 281 (Bankr.Mass. 1980). We have been presented with no other explanation for Dishaw's assertions of ownership in CCLD, his promise to pledge stock he had already pledged as collateral for another lender, or his other falsehoods, and the unavoidable conclusion is that no other explanation is possible.

■ We now consider the defenses raised by the debtor, which challenge, in the alternative, Guthrie's standing to initiate this adversary action and his proof of reasonable reliance under section 523(a)(2)(B)(iii). The first of Dishaw's defenses to Guthrie's claims is defeated by the text of the Bankruptcy Code. Dishaw argues that he made the representations at issue as an agent of BBY rather than as an individual. Because this action arises in the context of Dishaw's personal bankruptcy, the debtor concludes that the Court is without the power to consider Guthrie's complaint.

It is undisputed that Dishaw is personally indebted to Guthrie by virtue of his guaranty of repayment of the loan to BBY. Plainly Guthrie is a creditor of Dishaw's bankruptcy estate. *See* 11 U.S.C. § 101(9)(A) (defining "creditor"). Guthrie's option to pursue Dishaw upon his obligation as guarantor is contingent only upon the failure of BBY to make good on its debt, a contingency fulfilled in 1983. Consequently Guthrie possesses the requisite standing to initiate a complaint asserting nondischargeability.

Dishaw has ignored the plain language of the Code, for his statements as an "agent" are clearly within the purview of section 523(a)(2)(B)(ii). That subsection specifically provides creditors a cause of action for a debt incurred by use of a materially false written statement

(ii) respecting the debtor's *or an insider's* financial condition.

11 U.S.C. § 523(a)(2)(B)(ii) (emphasis added).

The Code defines "insider" in section 101(28):

(28) "insider" includes—

(A) if the debtor is an individual—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer or person in control[.]

11 U.S.C. § 101(28). Because Dishaw was president of BBY, there is no question that BBY is an insider with respect to Dishaw's bankruptcy. 11 U.S.C. § 101(28)(A)(iv). Consequently, the action *sub judice* is explicitly authorized by the Code. Even if the statute were less clear, we are confident that Congress intended that creditors possess an action for false statements made for the benefit of a corporate alter ego, for as the court stated in *In re Sobel*, 37 B.R. 780 (E.D.N.Y.1984),

[n]othing is more commonplace than for the owners of a small closely-held corporation ... to engage in fraud for the benefit of the corporation rather than for themselves directly. That a corporation is the beneficiary does not make the fraud any less.

37 B.R. at 786.

■ Dishaw contends, as a second defense, that the loan which is the basis of Guthrie's nondischargeability claim was a transaction completely distinct from the proposed investment in BBY. Since the representations alleged to be false were made in negotiations over the investment deal rather than in the course of the loan transaction, the debtor argues the plaintiff was not justified in relying upon them.

It is not inconceivable that parties involved in an ongoing business relationship might keep so separate a series of transactions that the information given in one could not reasonably be considered in another. The case at bar, however, does not present such a situation.

Guthrie testified that the loan transaction grew out of the prior negotiations regarding an investment in BBY. He testified also that the loan was a stop-gap measure, devised to provide needed cash for BBY pending Guthrie's investment decision. The time span of the negotiations, late January until early March, is so brief as to make inconceivable any strict separation of these two transactions. The documentary evidence lends credence to Guthrie's description of the transaction. The loan document is styled as an Option Contract for the Sale of Stock and Partnership Interest, and contains the following language:

WHEREAS Max Guthrie intends to purchase, for the sum of Two Hundred Fifty Thousand Dollars ($250,000.00):

One hundred thirty five (135) newly issued shares of stock from Breton Bay Yachts, Inc. (the Corporation) and

One half (½) of Robert A. Dishaw's one third (⅓) partnership interest in Cherry Cove Land Development, together with the right to acquire one (1) lot of the initial fifty (50) lots offered by Cherry Cove Land Development;

THEREFORE, Max Guthrie agrees to lend Breton Bay Yachts, Inc. the sum of One Hundred Thousand Dollars ($100,-000.00)[.]

Plaintiff's Exhibit A.

This document on its face is convincing evidence that the two transactions were not unrelated, as suggested by the debtor, but were inextricably intertwined. Guthrie naturally relied upon the information about BBY and about Dishaw's holdings when deciding to loan the company money. Dishaw's intention that Guthrie rely on his misrepresentations is evidenced by his reiteration of several of the false statements in the loan documents.

In this situation, the Court cannot accept the debtor's contention that Guthrie's reliance on his misrepresentations was not reasonable or justified. Even if the Court were to embrace the debtor's notion that Guthrie's prior questioning of the accuracy of the financial statements rendered unreasonable any subsequent reliance on the figures contained therein, Dishaw has presented no valid challenge to the reasonableness of Guthrie's reliance on Dishaw's other misrepresentations, several of which appear in the loan documents themselves. Accordingly, it is the ruling of this Court that Guthrie's reliance upon the debtor's falsehoods was reasonable.

In sum, having rejected each of the debtor's contentions, we find that the plaintiff has carried his burden under section 523(a)(2)(B) and so find Dishaw's $100,000.00 debt to Guthrie nondischargeable.

We now turn to the allegation of plaintiff United Virginia Bank ("UVB") that the November 14, 1983 judgment of the Circuit Court of Fairfax County, Virginia rendered in favor of UVB on a commercial note executed by the debtor and his wife is a debt not dischargeable in bankruptcy. UVB claims that the financial statement dated March 17, 1982 submitted by the debtor when requesting a loan of One Hundred Fifty Thousand Dollars ($150,000.00) was a materially false statement respecting the debtor's financial condition upon which UVB reasonably relied.

UVB bases its claim in large part upon two figures contained in the debtor's financial statement. The first, a figure of $175,000.00 in commissions due for the first quarter of 1982, appears in Dishaw's statement of assets. The second is Dishaw's figure of $380,000.00 in salary, bonuses and commissions for the calendar year 1982. In addition, UVB cites other representations contained in the financial statement, among them the debtor's inclusion of $23,000.00 in commissions due for the fourth quarter of 1981, and his statement that his taxes were "settled" through December 31, 1981.

UVB loan officer Robert Skrinski testified that the commission figures were of critical importance in his decision to approve a $150,000.00 unsecured loan to Dishaw; Skrinski stated that, had he known the actual income figures of the debtor, he would not have approved the loan. Skrinski acknowledged the inherent uncertainty of the figures given by Dishaw, noting that the figures represented either commissions due but not yet paid, or an estimate of yearly earnings. However, Skrinski verified Dishaw's $380,000.00 projection of his 1982 commissions with Bill F. Greshel, then Vice President for Finance and Administration of Terminals Unlimited, Dishaw's employer.

Dishaw does not contest the allegation of UVB that the figures in question misrepresent Dishaw's earnings over the relevant periods of time. Examination of his tax returns, which Dishaw testified were accurate, reveals that Dishaw's total wages for 1982 were $108,459.80, a far cry from his $380,000.00 estimate for that year and an amount significantly less than the debtor's $175,000.00 estimate for the first quarter of that year. The comparable amount on the debtor's joint return for 1981, which includes both his salary and that of his wife, whose occupation is listed as a secretary, is $42,468.00, a figure which casts considerable doubt on the proposition that Dishaw earned $23,000.00 in commissions in the final quarter of 1981. In 1984, Dishaw filed an individual return for 1981 reporting an annual income of $23,414.92.

Dishaw claims that his estimates were made in good faith, on the basis of information given him by Bill Greshel. Consequently, the debtor's challenge to UVB's assertion that its judgment is not dischargeable centers on subsections (i), (iii) and (iv) of section 523(a)(2)(B). Because the financial statement figures were plainly estimates, the debtor argues, any reliance by the bank was not reasonable within the meaning of section 523(a)(2)(B)(iii). In addition, because Dishaw obtained the underlying figures from an executive overseeing finance and administration, Dishaw argues, the figures were not false as required by section 523(a)(2)(B)(ii), and Dishaw was without the intent to deceive required by section 523(a)(2)(B)(iv).

Dishaw contends that a system of charging back expenses against commissions due salesmen, instituted in late 1981 or early 1982, caused the substantial shortfall in his income. Because TU head David Owens possessed complete autonomy over TU's calculation of commissions, the debtor argues, salesmen did not and could not know the extent to which the chargeback system would reduce their earnings.

The debtor makes one threshold argument which we address before we consider the merits of UVB's section 523 complaint. Dishaw testified that the loan in question

was made to Breton Bay Yachts, although Dishaw personally signed the note, acknowledged that he was the borrower, and admitted that the document contained no reference to BBY. The obvious implication of Dishaw's testimony is that BBY, rather than Dishaw, is the true party obligated on the note. This position is neither credible nor meritorious.

The Circuit Court of Fairfax County has already rendered a personal judgment against each of the Dishaws based upon their failure to pay this note. The debtor made no protestation before that court that the true party obligated on the note was BBY. The sole issue before this Court is the dischargeability of the judgment debt. We regard the liability of this debtor on the note supporting the judgment to be *res judicata.*

■ Even if the debtor's challenge to his liability on the note were before this Court for decision, the debtor could not prevail. Plainly, the document does not purport to bind BBY. The debtor offers no cogent explanation for this omission if, indeed, the loan was made to the corporation. The heading of the document, "Commercial Loan" is not dispositive, particularly in view of the fact that absolutely no information regarding the BBY venture was submitted to UVB. Logic dictates that the loan officer would require some information about the business and a measure of the health of the corporation even if the parties intended Dishaw's personal assets to stand as the bank's most reliable indicator of repayment. Instead, the bank examined only the Dishaws' personal financial statement. As Dishaw admitted, the document makes no reference to BBY, and is clear on its face that the $150,000.00 loan was made to Robert Dishaw and Sally Dishaw, who the Court notes held no office in the corporation, personally. On these facts, the Court is compelled to find that the UVB debt was a personal obligation.

■ Two issues are posed by the application of section 523(a)(2)(B) to the facts before the Court. We consider first Dishaw's claim that UVB's reliance on the debtor's estimated income figures was not reasonable. It is well-settled that a creditor's reliance on a financial statement is reasonable if information gathered by third parties fails to alert the creditor to the falsity of the statement. *See In re Byrd,* 41 B.R. 555 (Bankr.Tenn.1984); *In re Furimsky,* 40 B.R. 350 (Bankr.Ariz.1984). *See also In re Barnacle,* 44 B.R. 50 (Bankr.Minn.1984) (creditor's reliance reasonable if creditor followed normal business practice consistent with industry standards and acted with ordinary diligence). The mere fact that Dishaw estimated his annual income cannot render the bank's reliance on the statement unreasonable, for any statement of current annual salary is an "estimate", resting on the unspoken assumptions that the applicant will retain his position and his employer will remain in business. Particularly when a creditor takes prudent steps to verify an applicant's estimate, as UVB did, the single fact that income is projected cannot render the creditor's reliance unreasonable.

Similarly, UVB's alleged knowledge about the inner workings of TU's compensation scheme does not deprive the bank of the right to rely on the income figures submitted by Dishaw. The possibility that chargebacks, nonpayment of invoices, cancellation of orders or other administrative deductions of which the bank had knowledge might reduce the monies ultimately paid to Dishaw may have supplied the bank with good reason to discount the debtor's salary estimate. However, these factors do not render a verified salary estimate a figure without meaning upon which reasonable reliance may not rest. UVB took reasonable steps to determine the accuracy of the estimate, and was entitled to rely on the information supplied by Dishaw and TU. We find that the plaintiff has carried his burden under section 523(a)(2)(B)(iii).

Dishaw's alternative defenses center upon his assertion that the figures estimating his comissions and total income were accurate at the time he completed the Financial Statement. Relying on both documentary evidence and testimony, UVB argues that each of the estimates could not have been truthful.

*Estimate of Income for Year 1982*

█ Because he calculated his $380,-000.00 income figure based upon a tally of sales made by Bill Greshel, the debtor asserts, he believed them to be a truthful reflection of the commission income he could expect from TU. Greshel testified that the figure he gave Dishaw, which he obtained by examining customer invoices upon which Dishaw received a commission, was approximately $500,000.00 to $600,-000.00. Dishaw argues that he completed the financial statement in good faith reliance upon the numbers given him by Greshel, and cites as evidence of his good faith the fact that he reduced Greshel's figure to $380,000.00.

As previously noted, Dishaw cites TU's system of expense chargebacks as the unforeseeable cause of the vast difference between his actual 1982 income, $108,-459.90 and his $380,000.00 estimate. Greshel's deposition *de bene esse* testimony lends some credence to Dishaw's explanation; Greshel testified that Dishaw was the first salesman against whom TU charged back expenses, and described the chargeback system:

> [I]t was probably late '81, early '82 [that the charging-back began], because it was new. And first the charge-backs were going to be against hings that could be cost direct ... But then [TU] started charging administrative costs and a lot of other charge-backs, where it ended up in, I'd say 1983 or '84, it was almost everything was charged back.... [I]t was significant, and I was not aware that it was going to be done to that extent.

However, the debtor introduced no competent documentary evidence in support of his testimony that the newly-instituted system of chargebacks caused his 1982 income to fall short of the projection supplied to UVB. Undoubtedly, TU began in 1982 an increased policy of charging back expenses against commissions due salesmen; Di-

shaw, Greshel and Wilson all testified to this fact. The TU quarterly commission statements in evidence reveal a pattern of significant chargebacks. For the year 1982, the 40% of gross profits devoted to commissions totalled $380,092.32; $179,-722.06 in commissions were actually paid, leaving a rough amount attributable to chargebacks of $200,370.26.

The significant figures for evaluation of Dishaw's defense, however, are the first quarter sales figures, for these were the only figures available or capable of estimation at the time of his salary projection. The 40% of gross profit on federal marketing division sales equalled $23,412.40, of which Dishaw was entitled to 60%. Dishaw also had personal sales during this quarter on which his 40% share of the gross profit equalled $1,708.00. Based on the first quarter sales and not making any deductions for chargebacks, Dishaw could expect a first quarter commission income from federal marketing sales of $14,048.20 plus commission on personal sales in the amount of $1,708.00, or $15,755.20. Clearly, Dishaw could not have a good faith basis for his 1982 income projection of $380,000.00 because repetition of his first quarter performance would endow him with only a $63,020.80 annual commission income.[2] In view of this figure, Dishaw could not have relied in good faith on the estimate to which Greshel testified.

*Estimate of Commissions for the First Quarter of 1982*

Riley Wilson, who worked with Dishaw at TU's federal marketing division testified that the division's sales for the first quarter of 1982 were insufficient to justify Dishaw's stated expectation of commissions of $175,000.00. The Court finds Wilson's testimony particularly credible on this point, because Dishaw and Wilson split commissions on sales made by the division. For each sale, TU took 60% of the profit, leaving 40% to be split by the two sales-

---

2. It appears from the testimony that a good faith estimate of income calculated using equipment invoices *could* be undercut by customers' cancellation of orders or failure to pay invoices. Because Dishaw's estimate is purported to rest on Greshel's examination of invoices, it is at least theoretically possible that Dishaw's projection had some basis in fact. However, Dishaw has put forward no evidence of invoices cancelled or left unpaid sufficient to refute the net sales figures contained in TU's commission statements.

men, 60% to Dishaw and 40% to Wilson. Wilson's income, therefore, was directly tied to that of Dishaw. If Dishaw's expectation of $175,000.00 was legitimate, Wilson could expect a quarterly commission of $117,000.00, a figure which could hardly escape his notice. Wilson pronounced Dishaw's expected commission inconceivable. TU's records indicate that the total sales for the federal marketing group in the first quarter of 1982 was $292,534.00 upon which TU and its federal marketing salesmen split a profit of $23,412.40.

Wilson acknowledged that Dishaw might have expected commissions on personal sales made before the first quarter of 1982 in addition to federal marketing commissions. Dishaw testified that he had $1.5–million in sales in the third quarter of 1981 upon which he expected commissions and that these commissions, as distinguished from federal marketing sales commissions, were the basis of the $175,000.00 estimate of commissions contained in the financial statement submitted to UVB.

Dishaw supplied the Court with no documentary evidence in support of his personal sales figure, and the documents submitted by UVB undermine Dishaw's testimony. Because Dishaw's total income in 1981, as revealed on an individual income tax return filed in 1984 was $23,414.92, the conclusion is inescapable that no significant portion of the commissions due on this $1.5–million in sales could have been paid in 1981. TU calculated Dishaw's commission income for 1982 at $73,559.80 and his total income at $108,459.80. These figures would include both personal and federal marketing commissions paid in 1982. Although neither party tallied Dishaw's federal marketing commissions for 1982, it appears from TU's quarterly commission statements for 1982 that the company paid out $179,722.06 in commissions on federal marketing sales. According to Riley Wilson's testimony, a significant portion[3] of these commissions would be paid to Dishaw, leaving little

room for payment of commissions on personal sales given Dishaw's $73,559.80 annual commissions figure. In conclusion, it appears that TU did not pay commissions on Dishaw's supposed $1.5–million in 1981 personal sales any time during 1981 or 1982. This fact, considered in conjunction with the absence of any documentary evidence lending credence to Dishaw's assertion, casts considerable doubt on the debtor's testimony that he expected on March 17, 1982 commissions on $1.5–million in sales. We are not unaware that the *de bene esse* deposition testimony of Bill Greshel lends some support to the debtor's testimony. We find, however, that the uncontroverted documentary evidence compels a conclusion contrary to that put forward by the debtor.

The only other factor upon which Dishaw testified he based his projected commissions was his prior earnings. The sole evidence in the record bearing on this point are two 1981 tax returns. The first, a joint return, filed in 1982 shows a combined income for Robert A. and Sally Dishaw of $42,468.00; the second, an individual return filed in 1984 shows an income of $23,-414.92. Accordingly, this Court finds that Dishaw's previous earnings provide no basis whatsoever for the figures submitted to UVB.

Because we find Dishaw's estimates of commission and total income to be false statements upon which UVB reasonably relied, made with the requisite intent to deceive, we determine the judgment rendered by the Circuit Court of Fairfax County to be nondischargeable.

Appropriate orders will enter.

---

**3.** Wilson testified that Dishaw received 60% of the commissions on sales made by the federal marketing group. Sixty percent of the division's 1982 commissions amounts to $107,833.23, which exceeds Dishaw's commission income for the year. It is unclear whether the growth of the federal marketing group over the course of 1982 resulted in an alteration of the commission splitting described by Wilson.