**In re Dr. Richard G. PAOLINO and Elaine M. Paolino, Debtors.**

**John F. FLUEHR, Jr., et al., Plaintiffs,**

**v.**

**Dr. Richard G. PAOLINO and Elaine Paolino, Defendants.**

**Bankruptcy No. 85–00759F.
Adv. No. 86–0063F.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 5, 1988.

**454**

William M. Shields, Monteverde, Hemphill, Maschmeyer & Obert, Philadelphia, Pa., for plaintiffs.

Jonathan H. Ganz, Philadelphia, Pa., for Richard G. Paolino.

Jeffrey Meyers, Philadelphia, Pa., for Elaine M. Paolino.

Michael H. Reed, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for trustee.

Myron Bloom, Adelman Lavine Gold & Levin, Philadelphia, Pa., for Union Nat'l Bank.

James J. O'Connell, Philadelphia, Pa.

## OPINION

BRUCE I. FOX, Bankruptcy Judge:

This is a proceeding pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6) to determine dischargeability of various debts. In a previous opinion, reported at *In re Paolino*, 75 B.R. 641 (Bankr.E.D.Pa.1987), I denied the motion of defendant Elaine M. Paolino for summary judgment and set out much of the applicable law on agency. That opinion also serves as a straightforward and relatively simple introduction to the complex factual predicate of this case and shall not be repeated here.

After an extensive trial, the merits of the matter are now before me. I make the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The plaintiffs in this proceeding are John F. Fluehr, Jr., Richard J. Fluehr, Mary Lou Fluehr, Theodore Fluehr and Joyce M. Fluehr. Richard and Mary Lou Fluehr are husband and wife, as are Theodore and Joyce Fluehr. John Fluehr is the father of Theodore and Richard.

2. The Fluehrs collectively operate two funeral homes in Pennsylvania. One of the funeral homes also serves as the residence

of John, Theodore and Joyce Fluehr. The other serves as residence for Richard and Mary Lou Fluehr.

3. The defendants in this proceeding are Dr. Richard G. Paolino and Elaine M. Paolino. The Paolinos are husband and wife. They reside together at the same address.

4. Dr. Paolino was the family physician for Joyce and Theodore Fluehr and their children from approximately 1978 until 1983. Dr. Paolino was also physician for the Richard and Mary Lou Fluehr family during that period. John Fluehr was treated by Dr. Paolino on three or four occasions.

5. During the same period, Joyce and Theodore Fluehr saw the Paolinos socially approximately 8 or 10 times.

6. In the latter part of 1981, Dr. Paolino first advised Theodore Fluehr of his interest in purchasing a property in Bucks County, Pennsylvania, known as the William Tennant School property (the "school property") and of his plan to develop a life care facility there (the "life care project"). Some discussion then took place about the potential financial participation of the Fluehrs in the project.

7. Subsequent to that initial discussion, Theodore and Richard Fluehr attended a meeting at the law offices of Pearlstine, Salkin, Hardiman and Robinson ("the Pearlstine firm"). In addition to the Fluehrs, present at the meeting were Dr. Paolino, one or more lawyers from the Pearlstine firm and a representative of a bank. After listening to a discussion of the project, Theodore Fluehr was left with the impression that money was available from the bank to finance purchase of the school property by Dr. Paolino. (N.T. 1.85).

8. Shortly after this meeting, the Fluehrs received a copy of an agreement of sale for purchase of the school property by Dr. Paolino from its former owners. (Ex. P-1).

9. At approximately the same time, Dr. Paolino told Joyce Fluehr during an office visit that he "got the school". Joyce Fluehr apparently disseminated this information to the other Fluehrs. Additionally, there was testimony that on a number of occasions, Dr. Paolino stated he was owner of the school property. (N.T. 1.12, 1.75, 2.6). This testimony was undercut by Theodore Fleuhr's testimony that Dr. Paolino's ownership of the property was "sort of understood". (N.T. 1.75).

10. From these events, the Fluehrs developed the impression that Dr. Paolino had completed purchase and was therefore the owner of the school property. Theodore Fleuhr testified that he believed the property was owned by Dr. Paolino subject to a mortgage. (N.T. 1.100).

11. In April or May of 1982, John Fluehr pledged a certificate of deposit to Continental Bank in the amount of $100,-000 and Richard Fluehr pledged certificates of deposit totalling $40,000 to secure a loan to Dr. Paolino for architectural fees, advertising brochures and other expeditures related to the life care project.

12. Both John and Richard Fluehr testified that they would not have pledged their accounts to secure a loan to advance the life care project, if they had not believed Dr. Paolino already owned the school property. (N.T. 1.25, 2.13). In addition, they testified that they believed that in exchange for pledging their accounts, they would receive an unspecified interest in the life care project. (N.T. 1.25, 2.14).

13. On March 24, 1982, in exchange for the pledge of collateral by John and Richard Fluehr, the Fluehrs received a judgment note in the amount of $225,000, enforceable upon default by Dr. Paolino on the Continental Bank loan. The judgment note was signed by Dr. Paolino. Dr. Paolino also signed Elaine Paolino's name to the note upon Mrs. Paolino's express authority. (N.T. 3.24, 3.77).

14. At some time after pledging collateral to secure the Continental Bank loan, the Fluehrs received copies of an extensive brochure describing the life care project. (Ex. P-9).

15. Prior to September, 1982, Dr. Paolino informed the Fluehrs that he needed collateral for additional loans to advance

the life care project. Dr. Paolino expressly told the Fluehrs that the new loans were to be used to finance construction of the life care project. (N.T. 2.72, 3.49–3.50). Dr. Paolino believed at that time that collateral supplied by the Fluehrs would partially secure a bond issue which would provide construction financing. (N.T. 3.49–3.50).

16. The Fluehrs and Dr. Paolino discussed an agreement by which the Fluehrs would pledge approximately 21 investment properties owned by them either collectively or individually as security for what they believed to be a construction loan. These properties had a total value of approximately $1,000,000.00. The Fluehrs supplied the deeds to these properties to Dr. Paolino prior to September 13, 1982.

17. The Fluehrs did not agree to pledge their funeral homes as collateral for any loan to Dr. Paolino. The Fluehrs specifically informed Dr. Paolino that they were unwilling to pledge these properties because the funeral homes represented both their livelihood and their residences.

18. The Fluehrs' Philadelphia funeral home has a market value of approximately $300,000. (N.T. 1.34). The Bucks county funeral home has a market value of approximately $100,000. (N.T. 2.3).

19. The Fluehrs never obtained a lawyer to represent them in connection with any transaction with Dr. Paolino. Although in the past the Fluehrs had been advised and/or represented by certain relatives in the real estate business as to real estate transactions, they did not believe that advice or representation was necessary in their transactions with Dr. Paolino, because they trusted him as a friend and as their family doctor. They also believed that Dr. Paolino was sophisticated in the real estate business and that he would protect their interests.

20. The Fluehrs did not check the status of the title to the school property prior to agreeing to pledge collateral for what they believed to be the construction loan; neither did they attempt to ascertain

whether Dr. Paolino had equity in the school property. Theodore and Richard Fluehr testified that they believed that Dr. Paolino owned the property subject to a mortgage. (N.T. 1.99, 2.39).[1] John Fluehr's brother, a real estate agent, told John that the school property was worth more than $1,000,000. The Fluehrs assumed that their pledged collateral would not be foreclosed in the event of default, until, at least, after foreclosure upon what they believed to be Dr. Paolino's substantial equity in the property.

21. In exchange for pledging their property, the Fluehrs expected to receive three points on the value of the pledged property over a ten year period with 11% interest per annum. (See Ex. P–3). The Fluehrs also anticipated that they would receive an unspecified interest in the project itself.

22. On or about September 8, 1982, the Fluehrs received a copy of a document labelled "pledge agreement" which memorialized the terms of an understanding between the Fluehrs and Dr. Paolino. (Ex. P–3).

23. The portion of the pledge agreement labelled "Background" states:

WHEREAS, Paolino is the owner of a certain tract of ground located on Street and Newtown Roads, Warminster Township, Bucks County, Pennsylvania (the school property); and

WHEREAS, Paolino is developing a Continuous Life Care Center (hereinafter referred to as "Project") on the said tract of ground; and

WHEREAS, Paolino is in need of additional collateral of up to 2.5 Million Dollars to obtain the requisite financing to proceed with the Project; and

WHEREAS, Fluehr desires to lend their financial support to said project by utilizing certain pieces of their real property as collateral to assist Paolino in obtaining the necessary funds to proceed with the Project; and

(N.T. 1.58).

---

1. John Fluehr apparently assumed that Dr. Paolino owned the school property free and clear.

WHEREAS, Paolino desires to acquire and Fluehr desires to lend their financial support to the Project by utilizing certain pieces of the real property for collateral of up to 2.5 Million Dollars upon the terms and conditions hereinafter set forth.

24. The agreement provided that the three points to be received by the Fluehrs as set forth in finding of fact 21 were to be secured by a mortgage on the school property which would be subordinated to such other mortgages as Dr. Paolino might obtain to finance improvements on the school property.

25. On or about September 8, 1982, Dr. Paolino received a commitment letter from Univest Mortgage Co. which stated that the Fluehrs' property was necessary to collateralize a loan for purchase money for the school property. (Ex. P–21).

26. A meeting was scheduled for the evening of September 13, 1982 at the Fluehrs' Philadelphia funeral home in order to have all the necessary papers signed. The meeting took place at approximately 9:30 that evening, because the Fluehrs had been busy with funeral viewings and other business unrelated to the Paolino transaction.

27. At the meeting, the Fluehrs were unrepresented. Dr. Paolino attended with an attorney from the Pearlstine firm, F. Craig LaRocca, whom he introduced to the Fluehrs as "his lawyer". The Pearlstine firm, in general, and Mr. LaRocca, specifically, represented Dr. Paolino throughout the transactions with the Fluehrs.

28. Dr. Paolino and Mr. LaRocca brought with them various agreements, including the guarantee agreement, a collateral note and a mortgage. All of the various agreements including the pledge agreement between Dr. Paolino and the Fluehrs discussed above in findings of fact 22–24 were prepared by the Pearlstine firm.

29. All of the various agreements were given to the Fluehrs with the signature pages on top and the Fluehrs were asked to expedite execution due to the late hour so that the various parties could get home. (N.T. 1.11, 2.5, 2.47). The Fluehrs did not read the documents before signing them.

30. Joyce Fluehr specifically asked whether their funeral homes would be involved as security and was reassured by both Mr. LaRocca and Dr. Paolino that the funeral homes were not included. (N.T. 1.18, 1.86, 2.11, 2.19, 2.48). Dr. Paolino admits that the Fluehrs were told that their funeral homes were not at risk. (N.T. 3.58–3.59).

31. The mortgage which the Fluehrs executed on September 13, 1982 in favor of Univest Mortgage Co. had appendices including metes and bounds descriptions of the various investment properties which the Fluehrs believed they were pledging as collateral. Descriptions of the funeral homes were not included.

32. On September 13, 1982 Dr. Paolino did not own the school property. Closing on the school property did not occur until September 14, 1982.[2] Only at that time did Dr. and Mrs. Paolino become owners of the school property by the entireties.

33. The collateral provided by the Fluehrs was used to secure the loan by which Dr. Paolino purchased the property rather than for construction financing.

34. The collateral note executed by the Fluehrs on September 13, 1982 (P–6) contained a confession of judgment clause in favor of Univest Mortgage Co.

35. On or about March 15, 1983, the Fluehrs learned that Dr. Paolino was in default on his obligation to Univest Mortgage Co. (Ex. P–13).

36. On or about March 25, 1983, Univest Mortgage Co. entered two judgments against the Fluehrs by confession in the amounts of $1,130,547.94 and $848,069.18. (Exhibits P–15a and 15b).

37. By operation of law, these judgments act as a lien against all of the Fluehrs' real property including their funeral homes.

2. Although the Fluehrs were told of the September 14 closing, they were informed that it was unnecessary for them to attend. The Fluehrs apparently assumed that closing referred to closing on the construction loan rather than for purchase of the property.

38. On March 9, 1983, Continental Bank foreclosed on the certificates of deposit which had been pledged by the Fluehrs.

39. Evidence presented suggests that during the transactions at issue here, the Pearlstine firm represented Univest Mortgage Co. as well as the Paolinos. Dr. and Mrs. Paolino have sued the Pearlstine firm and Univest.

40. Although Mrs. Paolino acquiesced only reluctantly in the plan to develop the life care project, she did participate. Mrs. Paolino authorized Dr. Paolino to go forward, allowed him to use all of their jointly owned properties as collateral for the project and purchased the school property together with Dr. Paolino.

41. Dr. Paolino had complete although reluctant authority from Mrs. Paolino to act on her behalf as he saw fit in regard to the life care project. Dr. Paolino acted as Mrs. Paolino's agent at all times in regard to development of the life care project including when he retained the Pearlstine firm. Both Dr. Paolino and the Pearlstine firm acted on behalf of Mrs. Paolino in furthering the life care project which includes in their efforts to induce the Fluehrs to participate.

42. At all times relevant to this proceeding, Mrs. Paolino relied on Dr. Paolino in all respects in connection with management and investment of jointly owned property.

43. If Dr. Paolino's plan to develop a life care facility on the school property had been successful, Mrs. Paolino, as joint owner of the property, would have benefited.

## CONCLUSIONS OF LAW

1. Under 11 U.S.C. § 523(a)(2)(A), a debt incurred by the fraud of an agent can be rendered non-dischargeable as to the principal.

2. Dr. Paolino acted as agent for Mrs. Paolino throughout the transactions at issue.

3. The Pearlstine firm and Mr. LaRocca of that firm acted as agent for Dr. and Mrs. Paolino throughout the transactions at issue here. Mr. LaRocca acted as agent for Dr. and Mrs. Paolino at the September 13, 1982 meeting.

4. The evidence was insufficient to establish that the Pearlstine firm or Mr. LaRocca acted beyond the scope of their authority.

5. No misrepresentation was made to John or Richard Fluehr prior to their agreement to pledge certificates of deposit as collateral on the Continental Bank loan. Their assumption that Dr. Paolino owned the school property was not directly based on any affirmative representation to that effect made by Dr. Paolino.

6. Any debts of the Paolinos to the Fluehrs arising out of the Continental Bank foreclosure are dischargeable.[3]

7. Reasonable reliance is required to render a debt non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

8. Even if Dr. Paolino had misrepresented an ownership interest in the school property prior to the Continental Bank transaction, John and Richard Fluehr did not rely on that misrepresentation insofar as they concede that they had no knowledge about whether the Paolinos had equity.

9. For a significant period of time prior to September 8, 1982, both Dr. Paolino and the Pearlstine firm knew that the Fluehrs' guarantees were necessary to secure purchase money for the school property from Univest. The Univest commitment letter (Ex. P–21) of September 7 expressly so provides and it strains credibility to conclude that Dr. Paolino and the law firm were not aware of such a requirement during the mortgage application process.

10. The pledge agreement between the Fluehrs and Dr. Paolino (Ex. P–3) which was sent to the Fluehrs on or about September 8, 1988 affirmatively misrepresents Dr. Paolino's ownership of the school property and that the collateral being pledged

---

**3.** I do not pass on whether the agreement of March 24, 1982 (P–23) makes any portion of the debt secured.

would secure construction financing to proceed with the project.

11. The Pearlstine firm and Mr. La-Rocca knew that the presence of a confession of judgment clause in the collateral note placed all of the Fluehrs' property at risk including the funeral homes. Mr. La-Rocca affirmatively misrepresented to the Fluehrs that their funeral homes were not being placed at risk.

12. Misrepresentations as to the use and extent of the Fluehrs' collateral were intentionally made by Dr. Paolino and/or his agents for the express purpose of inducing the Fluehrs to enter into a security agreement which they otherwise would not have executed. Liability can be imputed to Mrs. Paolino for the acts of her husband and her lawyer as agents.

13. The Fluehrs justifiably relied on the misrepresentations made in connection with the Univest transaction.

14. The Fluehrs have proved by the requisite clear and convincing evidence that the Paolinos liability to them arising out of the Univest Mortgage Co. transaction are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

15. Insofar as the Fluehrs ultimate liability to Univest cannot be fully established as of this date, the Fluehrs claim will remain unliquidated.[4] Insofar as I have determined the Paolinos debt to the Fluehrs is non-dischargeable, the Fluehrs are free to ultimately pursue recovery directly from the Paolinos in any forum except to the extent that they remain bound by the automatic stay.

## DISCUSSION

This proceeding to determine the dischargeability of debts is brought primarily[5] pursuant to 11 U.S.C. § 523(a)(2)(A) which provides:

(a) A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .

I have jurisdiction to resolve this proceeding as a core matter pursuant to 28 U.S.C. § 157(b)(2)(I).

## I.

Many of the most significant issues in this proceeding are related to dischargeability of the debts of a principal arising from the fraud of his or her agent. In my prior opinion in this matter, *In re Paolino*, 75 B.R. 641 (Bankr.E.D.Pa.1987), I concluded that at the time the bankruptcy code was enacted, case law was settled under section 17a(2) of the former Bankruptcy Act that a principal was liable for an agent's fraud. *Id.* at 648 *citing Strang v. Bradner*, 114 U.S. 555, 5 S.Ct. 1038, 29 L.Ed. 248 (1885); 1A *Collier on Bankruptcy* ¶ 17.16 at 1641 nn. 25–26 (14th ed. 1978). I then noted:

> In *Midlantic National Bank v. New Jersey Department of Environmental Protection*, [474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986)] a case involving section 554 of the Bankruptcy Code, the Supreme Court emphasized the rule of statutory construction which instructs that if Congress intends to alter a statutory interpretation of longstanding, it clearly expresses that intent. The court again applied the principle of statutory construction in a bankruptcy case last

---

**4.** I have recently approved a sale of the school property with some of the proceeds to be paid to Univest. Additionally, the Chapter 11 trustee has proposed a plan of reorganization which may yield additional payments to Univest. Thus, it is impossible to determine now what sum, if any, the Fluehrs will be liable for on their guarantee.

**5.** Plaintiffs have not seriously pursued their claim under 11 U.S.C. § 523(a)(6) and I find that such limited arguments as have been made on the 523(a)(6) claim are virtually completely subsumed within their claim under 11 U.S.C. § 523(a)(2)(A). In any event, plaintiffs' claim under section 523(a)(6) has no independent merit and will be denied.

year, *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986).

*In re Paolino*, 75 B.R. at 649.[6] In short, I found that in enacting 11 U.S.C. § 523(a)(2)(A) Congress expressed no clear intent to legislatively overrule the case law making non-dischargeable a principal's debt for the fraud of an agent. Thus, I felt constrained to hold that, where agency is established and the agent commits fraud within the scope of the agency, that fraud is imputed to the principal for the purposes of section 523(a)(2)(A). *Id.* at 649–650. That holding constitutes law of the case.

At trial, evidence related to three potential agency relationships was presented. These were: 1) whether Dr. Paolino acted as agent for Mrs. Paolino; 2) whether the Pearlstine firm and Mr. LaRocca acted as agent to Dr. Paolino; and 3) whether the Pearlstine firm and Mr. LaRocca acted as agent to Mrs. Paolino. As set forth in the foregoing findings of fact and conclusions of law, I conclude based on the evidence that each of these three agency relationships existed and that certain misrepresentations were made within the scope of each agency relationship.

As to the agency relationship between Dr. and Mrs. Paolino, I have stated:

Under Pennsylvania law, there is no automatic, general agency arising from the marital relationship. However, there is a presumption with respect to entireties property that either spouse has the power to act for both without any specific authority, so long as the acting spouse's action benefits both. This presumption, with respect to entireties property, does not require knowledge on the part of the other spouse. The presumption can be rebutted by evidence that the acting spouse was not authorized to act for both. *See J.R. Christ Construction Co.* [*v. Olevsky* ], 426 Pa. 343, 232 A.2d 196 (1967); *Bradney v. Sakelson*, 325 Pa.Super. 519, 473 A.2d 189 (1984).

*In re Paolino*, 75 B.R. at 644–645 *quoting*, *In re Paolino*, 72 B.R. 323, 328 (Bankr.E.D.Pa.) *aff'd.* 75 B.R. 553 (E.D.Pa.1987).

■ At trial, evidence was presented that various entireties properties were used as security to advance the life care project. More importantly, however, Mrs. Paolino testified that she agreed, albeit reluctantly, to have Dr. Paolino go forward as he saw fit with the life care project because she made a deliberate choice to remove herself from the specific day-to-day decision-making related to the project. Moreover, she purchased the school property jointly with her husband and stood to benefit if the project came to fruition. The evidence is sufficient to establish that Mrs. Paolino expressly made Dr. Paolino her agent for all purposes in connection with purchase of the school property and development of the life care project. *See generally, In re Paolino*, 72 B.R. at 328–329; *Sidle v. Kaufman*, 345 Pa. 549, 29 A.2d 77 (1942); *Tonuci v. Beegal*, 188 Pa.Super. 66, 145 A.2d 885 (1958). Any representations Dr. Paolino made to the Fluehrs to advance the life care project are thus within the scope of his agency.

■ It is not seriously disputed that Dr. Paolino hired the Pearlstine firm and Mr. LaRocca to act as his agent with regard to the purchase of the school property and development of the life care project. Insofar as Dr. Paolino had general authority from Mrs. Paolino in these matters, the Pearlstine firm and Mr. LaRocca became her agents as well. What is disputed, however, is whether the Pearlstine firm and/or Mr. LaRocca acted beyond the scope of their authority in making certain representations to the Fluehrs. That issue is injected in the case by evidence that the Pearlstine firm was representing Univest Mortgage Co. at the same time as it represented the Paolinos. The Paolinos argue that a hidden conflict of interest renders any representations made to the Fluehrs by Mr. LaRocca outside the scope of the agency

---

**6.** The Supreme Court very recently restated the applicable principals of statutory construction in a context other than bankruptcy. *Pierce v. Underwood*, —— U.S. ——, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) *citing Lorillard v. Pons*, 434 U.S. 575, 580–581, 98 S.Ct. 866, 869–70, 55 L.Ed. 2d 40 (1978).

relationship.[7] They implicitly argue that any misrepresentations were made to advance Univest's interests rather than those of the Paolinos.

■ I note that once an agency relationship is established, the burden is on the principal to show that the agent acted beyond the scope of his or her authority. *Clements v. Macheboeuf,* 92 U.S. 418, 23 L.Ed. 504 (1875); *Zambruk v. Perlmutter 3rd Generation Builders, Inc.,* 32 Colo. App. 276, 510 P.2d 472 (1973); *United Brotherhood of Carpenters and Joiners v. Humphreys,* 203 Va. 781, 127 S.E.2d 98 (1962). *Cf. In re Scott,* 82 B.R. 760, 762 (Bankr.E.D.Pa.1988) (burden on client to establish attorney lacked authority to settle).

■ Here the evidence is insufficient to establish that the misrepresentations made by the Pearlstine firm or by Mr. LaRocca were beyond the scope of the agency. On September 13, 1982, Dr. Paolino very much needed the Fluehrs to provide guarantees in order to purchase the school property and to advance the life care project. To this end, Dr. Paolino had retained the Pearlstine firm, introduced Mr. LaRocca to the Fluehrs as "his lawyer" and had Mr. LaRocca or the firm draft and explain the papers to the Fluehrs. Subsequent events, little evidence of which is part of the record in this case, apparently convinced the Paolinos that the Pearlstine firm and Univest Mortgage Co. had ill-served their interest. I cannot conclude that Dr. Paolino has carried his burden to establish that representations made by Mr. LaRocca or by the Pearlstine firm to the Fluehrs were beyond the scope of the agency.[8]

Given that the Paolinos jointly are responsible for various representations made to the Fluehrs, I must consider whether the Fluehrs have carried their burden on each required element under section 523(a)(2)(A).

## II.

As I stated in my earlier opinion in this matter:

[i]n order to prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must prove that: (1) the debtor made a materially false representation; (2) the representation was made with intent to deceive; (3) the creditor justifiably relied on the representation; and (4) the creditor sustained proximate damage as a result of the representation. *In re Gelfand,* 47 B.R. [876] at 879 [Bankr.E.D.Pa.1985]; *accord, In re Woods,* 66 B.R. 984 (Bankr.E.D. Pa.1986).

*In re Paolino,* 75 B.R. at 646. As to each element, the burden is on the creditor, which must establish its case by clear and convincing evidence. *Id.* *See also e.g., Matter of Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987); *In re Black,* 787 F.2d 503, 505 (10th Cir.1986); *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986); *Matter of Bogstad,* 779 F.2d 370, 372 (7th Cir.1985); *In re Martin,* 761 F.2d 1163, 1165 (6th Cir.1985).[9]

7. To the extent that the Paolinos contend that hidden conflicts of interest precluded any employee of the Pearlstine firm from ever becoming their agent, their argument has little merit. Potential conflicts of interest do not *per se* preclude formation of an agency relationship. The evidence was not sufficient to establish that the Pearlstine firm never acted for the Paolinos. *See* N.T. 3.9 to 3.10.

8. I am also aware of various cases under Pennsylvania law which essentially hold that a principal may be liable for an agent's fraud which is beyond the scope of the agency on the theory that "where one of the two innocent persons must suffer because of the fraud of a third, the one who has accredited him must bear the loss." *Rothman v. Fillette,* 503 Pa. 259, 469 A.2d 543 (1983); *Keller v. N.J. Fidelity and Plate Glass Insurance Co.,* 306 Pa. 124, 159 A. 40 (1932).

Given my conclusion that the alleged representations were within the scope of the relevant agency relationships, I need not decide whether the principals of *Rothman* and *Keller* may preclude dischargeability under section 523(a)(2).

9. As I discussed recently in a case dealing with a creditor's burden in proving fraud under 11 U.S.C. § 727, historically, an elevated standard for proof of fraud has generally been required both in bankruptcy and without. *In re Garcia,* 88 B.R. 695, 702–06 (Bankr.E.D.Pa.1988). Use of a clear and convincing standard under section 523(a)(2) has been widely accepted, but courts are not unanimous. *See In re Showalter,* 86 B.R. 877, 17 B.C.D. 1007, 1009 (Bankr.W.D. Va.1988); *In re Daboul,* 85 B.R. 197, 17 B.C.D. 660, 661–662, 85 B.R. 197 (Bankr.D.Mass.1988); *In re Carr,* 49 B.R. 208, 210 (Bankr.W.D.Ky. 1985); *In re Baiata,* 12 B.R. 813, 817 (Bankr.E.

One issue which has recently received some judicial attention is whether proof of justifiable or reasonable reliance on the debtor's representations is required under section 523(a)(2)(A). *Compare e.g. In re Ophaug,* 827 F.2d 340, 342–343 (8th Cir. 1987) (reasonable reliance not required) [10] *with In re Mullet,* 817 F.2d 677, 678–679 (10th Cir.1987) (contra).[11] In *Ophaug,* the Eighth Circuit Court of Appeals concluded that since Congress expressly included a requirement of reasonable reliance in 11 U.S.C. § 523(a)(2)(B), but not in § 523(a)(2)(A), relevant provisions of statutory interpretation require a conclusion that reasonable reliance is not a prerequisite to a case under the latter provision. I cannot agree. I find more persuasive the reasoning of the Tenth Circuit in *Mullet* which concluded that in enacting section 523(a)(2) Congress did not express a clear intention to overrule well established case law requiring reasonable or justifiable reliance under section 17a(2) of the bankruptcy Act. I do not find the express requirement of reasonable reliance in § 523(a)(2)(B) to constitute the requisite clear expression by Congress, insofar as it is § 523(a)(2)(A) which recodifies 17a(2). To the extent that the legislative history addresses this point, there is no suggestion of disapproval of the case law under the Act requiring reasonable reliance. If anything, the legislative history suggests that Congress believed it was codifying case law under § 17a(2) requiring reasonable reliance. *See* H.R.Rep. No. 95–595, 95th

Cong., 1st Sess. 364 (1977); S.Rep. No. 95–989, 95th Cong. 2d Sess. 78 (1978) U.S. Code Cong. & Admin.News 1978, pp. 5787, 5863, 6319. Under the principals of statutory construction discussed above, as restated recently by the Supreme Court in *Midlantic* and *Kelly v. Robinson,* I must conclude that reasonable reliance is required under section 523(a)(2)(A).

■ I note as well that justifiable reliance has historically been an element of proof of fraud under the common law. *See* Keeton, *Prosser on Torts* § 108 (5th ed. 1984) ("Prosser"). I can see no justification for requiring a less rigorous case to prove fraud in bankruptcy than without.[12] It would make little sense to find an unliquidated debt non-dischargeable, if that creditor could not establish the same debt in a state court proceeding. In Pennsylvania, reasonable reliance has long been a necessary element of proof of fraud. *See e.g., Savitz v. Weinstein,* 395 Pa. 173, 149 A.2d 110 (1959); *Neuman v. Coin Exchange National Bank and Trust Co.,* 356 Pa. 442, 51 A.2d 759 (1947). *See generally, In re Daboul,* 85 B.R. 197, 17 B.C.D. 660, (Bankr.D.Mass.1988) (discussion of the interrelationship between dischargeability claims in bankruptcy and policies underlying issue preclusion). Especially given the requirement that exceptions to dischargeability be construed narrowly, e.g., *In re Hunter,* 780 F.2d at 1579, a debt should not be found non-dischargeable in bankruptcy

D.N.Y.1981). *See also Combs v. Richardson,* 838 F.2d 112, 116 (4th Cir.1988). I am disinclined to apply a standard other than clear and convincing evidence to a case under section 523(a)(2)(A), given the long tradition of application of that standard to dischargeability issues involving fraud in this judicial district. *See In re Colasante,* 12 B.R. 635, 639 (E.D.Pa.1981); *In re Emery,* 52 B.R. 68, 70 (Bankr.E.D.Pa.1985); *In re Liberati,* 11 B.R. 54, 56 (Bankr.E.D.Pa. 1981); *In re Tomeo,* 1 B.R. 673, 677 (Bankr.E.D. Pa.1979).

10. *Accord e.g., In re Sobel,* 37 B.R. 780, 785–86 (Bankr.E.D.N.Y.1984); *In re Fosco,* 14 B.R. 918, 921–23 (Bankr.D.Conn.1981). *See also In re Showalter,* 86 B.R. 877, 17 B.C.D. 1007, 1010 (Bankr.W.D.Va.1988) (no requirement of reasonable reliance in "friendship type" transaction).

11. *Accord e.g., Phillips v. Coman,* 804 F.2d 930 (6th Cir.1986); *In re Hunter,* 780 F.2d 1577 (11th Cir.1986); *In re Kimzey,* 761 F.2d 421, 423 (7th Cir.1985). *See also* Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 253, 258 (Summer, 1979).

12. This statement applies with equal force to the requirement that clear and convincing evidence be used to prove fraud under section 523. I note that clear and convincing evidence of fraud is required in Pennsylvania courts. *See e.g., Gerfin v. Colonial Smelting and Refining Co.,* 374 Pa. 66, 97 A.2d 71 (1953). *See generally, In re Daboul.*

on proof insufficient to establish the debt in state court.[13]

### III.

I turn now to whether the Fluehrs have established all of the elements of their case by the requisite clear and convincing evidence. They argue that the Paolinos are responsible for three distinct misrepresentations in the transactions at issue. These are: 1) that Dr. Paolino claimed to own the school property prior to requesting loan guarantees; 2) that the guarantees were to be made for the purpose of securing a construction loan; and 3) that the guarantees being made would not put the Fluehr funeral homes at risk. The first two alleged misrepresentations are obviously closely related. The Fluehrs contend that ownership of the school property was significant to their decision to make the guarantees, because they expected protection from Dr. Paolino's equity. That they were helping to finance a construction loan was important, because they did not want to participate unless the project was well advanced.

■ I find that the guarantees made to assist in securing the Continental Bank loan must be analyzed separately from the transaction involving the Univest loan. As to the Continental Bank loan the only asserted misrepresentation involves ownership of the school property. On that point, the evidence presented simply does not support, by a clear and convincing standard, an inference that Dr. Paolino affirmatively misrepresented that he owned the school property before the Fluehrs pledged property to secure the Continental Bank loan. Even assuming that Dr. Paolino made the statement that he "got the school", I cannot conclude that he intended the Fluehrs to understand that he owned the school property. The testimony suggests that the Fluehrs made an assumption that the property was owned.

Additionally, even if Dr. Paolino did represent that he owned the school property, there is insufficient evidence to establish that the Fluehrs actually relied on that statement. The Fluehrs claim that Dr. Paolino's ownership of the school property was significant in their decision on whether to provide guarantees to advance the life care project because they expected to be protected by the Paolinos equity in the school property. Even if Dr. Paolino misrepresented his ownership of the property, he never claimed to have equity and the Fluehrs apparently never asked and never investigated.

Thus, as to the Continental Bank guarantees, I conclude that the Fluehrs did not carry their burden to establish a material misrepresentation or that they relied on the representation as claimed. Analysis of the Univest transaction, however, is significantly more complex.

As laid out above in my findings and conclusions, either Dr. Paolino or his attorney, as agent, made each of the three misrepresentations asserted by the Fluehrs prior to or during the September 13, 1982 meeting at which the pledge agreements were signed. It is undisputed that the Fluehrs were told that their funeral homes were not at risk. I have already concluded that the Paolinos are responsible for that misrepresentation, even if it was made with *scienter* by their lawyer only.

The other misrepresentations are included in the written pledge agreement (Ex. P–3) which was provided to the Fluehrs on or about September 8, 1988. On that date the Paolinos did not own the school property as represented in the agreement. On or about the same date, the Paolinos received a commitment letter from Univest indicating that the Fluehrs guarantees were necessary to obtain the purchase money for the school property. (Ex. P–21). I can only conclude that Dr. Paolino in applying for the purchase money loan made known to Univest the availability of the Fluehrs' guarantees. Under these circumstances, Dr. Paolino's testimony that he believed that the Fluehrs were guaranteeing the construction loan is not credible.

---

**13.** The converse is not necessarily true. *See In re Cobley*, 89 B.R. 446, 452 n. 8 (Bankr. E.D.Pa.1988).

The evidence is clear and convincing that the debtors made (or are responsible for) material misrepresentations and that the misrepresentations were made with intent to deceive the Fluehrs and to induce them to provide the guarantees to Univest Bank which they ultimately did supply. Additionally, no party argues that the Fluehrs did not suffer damage insofar as they lost an interest in property including their funeral homes.[14] The most troubling issue in this case, however, is whether the Fluehrs have established their justifiable reliance.

It is clear from the evidence that the Fluehrs did little to affirmatively investigate the transaction and thereby to protect their interests. No title search or appraisals were done and no direct contact was made with Univest Mortgage Co. to determine the circumstances of the loan to the Paolinos. Additionally, the Fluehrs did not hire an attorney or other professional to review the transaction and advise them. That is unusual and certainly unwise in a transaction involving more than one million dollars in property. Apparently, the Fluehrs placed an almost childlike faith in Dr. Paolino to protect their interests and unequivocally relied on his good faith. The question posed is whether such reliance can be justifiable under the circumstances.

On the parameters of justifiable reliance, *Prosser* has recently stated:

> The last half-century has seen a marked change in the attitude of the courts toward the question of justifiable reliance. Earlier decisions, under the influence of the prevalent doctrine of "caveat emptor," laid great stress upon the plaintiff's "duty" to protect himself and distrust his antagonist, and held that he was not entitled to rely even upon positive assertions of fact made by one with whom he was dealing at arm's length. It was assumed that any one may be expected to overreach another in a bargain if he can, and that only a fool will expect common honesty. Therefore the plaintiff must make a reasonable investigation, and form his own judgment. The recognition of a new standard of business ethics, demanding that statements of fact be at least honestly and carefully made, and in many cases that they be warranted to be true, has led to an almost complete shift in this point of view.

> It is now held that assertions of fact as to the quantity or quality of land or goods sold, the financial status of corporations, and similar matters inducing commercial transactions, may justifiably be relied on without investigation, not only where such investigation would be burdensome or difficult, as where land which is sold lies at a distance, but likewise where the falsity of the representation might be discovered with little effort by means easily at hand. The plaintiff is not required, for example, to examine public records to ascertain the true state of the title claimed by the defendant. It is only where, under the circumstances the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own. The comparative availability of information to the parties may, however, be of considerable importance in determining whether the representation is to be regarded as an assurance of fact, or merely as a statement of opinion.

The requirement of justifiability according to the Second Restatement of Torts refers to whether or not the representation relates to a matter about which a reasonable person would attach importance in determining a choice of action. It relates therefore to (a) immaterial misrepresentation, (b) opinions and statements of intention that are commonly regarded as dealer's talk or puffing, and (c) statements about the law. It does not refer to contributory negligence in failing to discover the falsity of a represent-

---

**14.** The damages flowing from any misrepresentation as to the funeral homes being included in the guarantee, are limited to any damages arising from Univest's currently held security interest in the funeral homes. Any other loss of property by the Fluehrs emerges only from the other misrepresentations.

ative about a matter which a reasonable person would regard as of substantial importance.

*Prosser,* § 108 at 751–753 *citing* Second Restatement of Torts § 538(2)(b) (footnotes omitted).

This liberalization of standards to establish justifiable reliance is based at least in part upon a growing realization that the purpose of a requirement of justifiable reliance is to provide "the objective corroboration to plaintiff's claim that he did rely." *Id.* at 750. *Accord e.g. Matter of Garman,* 643 F.2d 1252, 1256, 1259 (7th Cir.1980) *cert. denied* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). In determining whether reliance is reasonable, it may be appropriate to distinguish between large corporate plaintiffs such as commercial lenders and relatively unsophisticated individuals. *See e.g., Phillips v. Coman,* 804 F.2d 930, 933 (6th Cir.1986).

 In the case at bench, in hindsight, it is easy to conclude that the Fluehrs' reliance on Dr. Paolino and attorney La-Rocca was unwise. However, under the circumstances I cannot conclude that their reliance was not justified. The Fluehrs had no affirmative obligation to conduct an investigation to determine, e.g., the truth of representations regarding ownership of property. *Phillips v. Coman. See also, Bowman v. Home Life Insurance Co. of America,* 260 F.2d 521 (3rd Cir.1958). Moreover, various decisions indicate that friendship between parties to a transaction may be a basis for justifiable reliance. *Phillips v. Coman,* 804 F.2d at 933; *Matter of Garman,* 643 F.2d at 1259. *See also, In re Showalter,* 86 B.R. 877, 17 B.C.D. 1010 (Bankr.W.D.Va.1988) (no requirement that reliance be justifiable between friends).

Here, the Fluehrs had been friendly with the Paolinos for a significant period of time. Additionally, Dr. Paolino occupied a position of trust as their family doctor. Under these circumstances, I cannot conclude that their failure to investigate or obtain independent review of legal documents was unjustifiable.

The Paolinos debt to the plaintiffs emerging from the guarantees made to Univest is therefore non-dischargeable.

### IV.

Under normal circumstances, having heard a dischargeability case on an unliquidated debt, and having determined that the plaintiffs successfully proved their case, it would be appropriate to liquidate the debt. In the case at bench, however, the precise degree of damages are not yet determinable. Univest has not executed upon the judgment it holds against the Fluehrs' property and to the extent they recover directly from the Paolinos, their judgment against the Fluehrs will be satisfied.

By this determination that their claims against the Paolinos arising from the Univest guarantees are non-dischargeable, the Fluehrs will be free to ultimately seek recovery from the Paolinos if their claim matures, except to the extent they are bound by the automatic stay. I thus see no need to liquidate the Fluehrs' claim at this time.[15]

Judgment will be entered in accordance with this opinion.

### ORDER

AND NOW, this 5 day of August, 1988, upon consideration of evidence submitted at trial and the parties' post-trial submissions, it is ORDERED that the Chief Deputy Clerk in Charge of Bankruptcy Operations shall enter judgment, in accordance with Bankr. Rule 9021, as follows:

in favor of plaintiffs and against the defendants to the extent that any damages arising out of plaintiffs' guarantees made to secure defendants' loan(s) from Univest Mortgage Company are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

---

**15.** To the extent that the Fluehrs seek relief in this court, they may have their proof of claim resolved in accordance with 11 U.S.C. § 502 and other relevant provisions of the bankruptcy code. *See In re Stelweck,* 86 B.R. 833, 844–45 (Bankr.E.D.Pa.1988).