**In re Lanny R. HOWARTER, Debtor.**

**Fred COOKE, Plaintiff,**

**v.**

**Lanny R. HOWARTER, Defendant.**

**Bankruptcy No. 85–0557–MINV7.**
**Adv. No. C85–0829–MINV7.**

United States Bankruptcy Court,
S.D. California.

Jan. 5, 1989.

The creditor, Mr. Cooke, has the burden of establishing the elements of non-dischargeability by clear and convincing evidence. The elements which must be established are:

(1) the debtor made the misrepresentations;

(2) at the time they were made the debtor knew they were false;

(3) the debtor made them with the intention and purpose of deceiving the creditor;

(4) the creditor relied on said representations;

(5) the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Griesgraber,* 56 B.R. 653, 656 (Bankr. S.D.Cal.1986). In addition, as discussed *infra,* a creditor must show that any reliance was reasonable.

After considering the pretrial order and the evidence adduced at trial, the Court makes the following findings of fact:

1. Plaintiff Cooke first had contact with the defendant Howarter in 1982 or 1983 when Cooke invested $10,000 in an accounts receivable factoring, which lasted 30 days. Cooke received his money back plus a profit.

2. The next contact between plaintiff Cooke and defendant Howarter did not occur until late July, 1984, at the earliest. At that time Cooke called Howarter to inquire about an investment available through Howarter in Chacklan Enterprises, Inc.

3. In between contacts with plaintiff Cooke, Howarter had become heavily involved in Chacklan Enterprises, both as an investor and as a procurer of funds for Chacklan.

4. Howarter first learned of Chacklan from a client around late August or early September of 1983.

5. Over the next several months Howarter worked to satisfy himself about the nature of Chacklan both as an entity and as an investment. He met with Chacklan's

Steven L. Klein, San Diego, Cal., for plaintiff.

William A. Smelko, San Diego, Cal., for defendant.

## MEMORANDUM DECISION

PETER W. BOWIE, Bankruptcy Judge.

The issues before the Court concern whether Howarter's debt owed to Cooke is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) and, if so, what is the amount of that debt.

president and vice-president, and with its counsel. He checked with Dun & Bradstreet, with the Better Business Bureau, and with Chacklan's banks. Howarter also made a trip to Mexico in November, 1983 to meet with Chacklan's suppliers and look at the estuaries.

6. At some point during Howarter's investigation of Chacklan, Howarter discussed becoming a procurer of investors with Chacklan management. By October 28, 1983 an agreement was reached and was reduced to writing, as evidenced by Exhibit 5. On that same date, Howarter made a first investment in Chacklan of $150,000, as reflected in Exhibit 4.

7. The parties have stipulated in the pretrial order that between October, 1983 and April, 1984 Howarter obtained approximately $4,000,000 in investor funds for Chacklan.

8. On March 21, 1984 plaintiff Cooke met with his accountant David Taddeo for the purpose of providing the information Taddeo needed to prepare Cooke's tax returns. During the meeting, Cooke asked Taddeo if Taddeo knew of any good investments. Cooke explained that he had equity in a rental property and he wanted to put it to work.

9. In response to Cooke's inquiry, Taddeo explained about Chacklan. At that time Taddeo told Cooke that he had personally invested in Chacklan, and that he was also finding new investors for Howarter. Taddeo told Cooke that Chacklan was involved in bringing seafood to the United States from Mexico and selling it to distributors after it cleared United States authorities. Chacklan would obtain short term loans from its bank, using investor funds in an account as collateral for the loans. When the product was sold, the loans would be repaid. Mr. Taddeo testified that he had a "pat" explanation for how the collateral funding account worked and that he is sure he gave that explanation to Cooke. Mr. Taddeo also told Cooke about insurance which existed to protect against loss from spoilage as well as from post-sale product liability. Mr. Taddeo did not recall whether he told Cooke about a surety policy to protect against corporate officer defalcations.

10. During the course of the March 21, 1984 meeting between Mr. Cooke and Mr. Taddeo, Mr. Taddeo showed to Mr. Cooke a copy of the "prospectus" describing the investment which Mr. Taddeo was distributing to the investors he brought to Howarter. Taddeo testified his "prospectus" was virtually identical to the one distributed by Howarter except for changes in names. Mr. Taddeo did not permit Mr. Cooke to keep the prospectus because he did not want Howarter to think he was trying to take Cooke as his own investment client.

11. During the same meeting, Mr. Taddeo also "penciled out" the tax consequences if Cooke were to take out a second loan on his income property, how the interest on the loan would be handled, and how the income from the investment would affect his taxes.

12. On April 7, 1984 Cooke went to Mr. Taddeo's office to pick up his tax returns. They met for 5–10 minutes and reviewed the Chacklan investment. Mr. Taddeo again showed Cooke the "penciled out" worksheet. When Cooke left, he gave no indication that he had made any decision about investing in Chacklan.

13. On May 1, 1984 Chacklan provided Howarter with two checks representing the earnings of investments made through Howarter. One check, in the approximate amount of $372,000, was returned to Howarter for non-sufficient funds.

14. Howarter promptly contacted Chacklan management about the bad check. He was told the company was going through a seasonal slump, but that Chacklan would make up the $372,000 by smaller weekly payments. Howarter testified that Chacklan did so and that the bad check was made good by mid-June, 1984. However, while the payments were made on the bad check, other payments came due but were not made by Chacklan.

15. Around May 15, 1984 Howarter met with Chacklan management. According to his note of that date (Exhibit 9), he was

concerned about not knowing enough about the company's periodic financial status to assess whether the company was heading toward difficulty. Howarter requested that he be provided with monthly financial statements. He was told he would receive them.

16. Sometime in May, 1984 Howarter received the first balance sheet and profit and loss statement, both documents for the period ending April 30, 1984. The balance sheet showed cash in bank as $65,776.35 and inventories at $1.912 million (Exhibit 10).

17. Knowing that his own investors had put in $4 million or more, Howarter asked Chacklan management about the "discrepancy." He was told that the accountant had prepared the statement without management's review and that the problem would be identified and a corrected statement sent.

18. Thereafter, Howarter received the "corrected" statement, which changed the inventories to $6.912 million. The other figures remained the same. Howarter testified that he was not concerned about the "cash in bank" figure of $65,000 because he assumed that number merely represented an accounting function reflecting the pledge of investor funds in the collateral account as inventory, rather than cash.

19. On May 17, 1984 Cooke called Mr. Taddeo and asked how the interest on the equity loan on the rental property would be reported, on the rental income schedule or on Schedule A. In addition, they discussed how much Cooke would have to raise the rents on the property to meet the payments if the investment did not generate income. There was discussion, as well, about whether Cooke should borrow $20,000 or $30,000. Mr. Taddeo did not believe that Cooke had decided to invest at that point.

20. Howarter did not receive any payments from Chacklan after June 24, 1984. Nevertheless, as persons who invested through him were due earnings payments, Howarter made those payments in June, July, and August out of his own funds.

21. The balance sheet and profit and loss statement for the period ending June 30, 1984 reflected approximately $6 million in inventory, $2.3 million in accounts receivable, and $2,684.78 in cash. Howarter testified he called about it and was again told of the seasonal slow down. In addition, Chacklan's vice-president sent a letter to the direct Chacklan investors, including Howarter, explaining the temporary cash flow problem. Howarter did not pass the letter or its contents on to his own investors.

22. Cooke testified that he originally thought that his first contact with Howarter about the Chacklan investment was by phone in early August, 1984. However, after ascertaining that he orally applied for the property loan on July 27, 1984 Cooke now believes his first contact with Howarter was just prior to July 27. Howarter testified that his first "real recollection" of a discussion with Cooke was "around July 1984." Howarter believes that the first serious discussion was in the second week of August. The Court finds that Cooke's first call to Howarter was in late July, 1984.

23. There is more ambiguity than conflict about what may have been said during Cooke and Howarter's first phone conversation about the Chacklan operation and investment opportunity. However, there is no evidence to suggest that Cooke requested or Howarter sent to Cooke the prospectus, the Chacklan balance sheets and profit and loss statements, or any other documents. Cooke testified he does not recall whether the collateral funding account provision was discussed. He stated that Howarter "may not have said anything about it." In his deposition, Cooke testified that Howarter did not explain what the collateral funding account provision was. According to Cooke, Howarter did tell him about the protection of various insurance policies.

24. During the second week of August, Howarter was contacted by another investor in Utah who advised that he had a major potential investor named Dellario. Dellario came to San Diego and met with Howarter and Chacklan officials. Dellario advised he wanted the Chacklan financial statements audited. Chacklan said they

would be provided. When they were not provided after several days, Howarter hired a Utah CPA to audit the financial statements of Chacklan, so as to meet the needs of Dellario as a possible investor.

25. The accountant came to San Diego and spent several weeks conducting his review. One of the early discoveries came from a physical inspection of inventory at Union Ice. Howarter concluded there was less inventory than there should be, and inquired of Chacklan management.

26. Chacklan management disclosed to Howarter for the first time that Chacklan had withdrawn investor monies from the collateral fund account and paid the monies in Mexico for both government and private sector supply contracts for the upcoming fishing season. Howarter requested evidence of the payments.

27. Approximately one week later, still in August, 1984, receipts in Spanish were produced, along with persons from Mexico who attested to them. The receipts totalled approximately $7.1 million in payments.

28. Howarter testified that he was distressed that the investor monies had been withdrawn from the collateral funding account and had been taken into Mexico. However, after reviewing the receipts and listening to the various oral assurances he was given, Howarter was satisfied the receipts were authentic and that the monies had purchased valuable future product commitments for the company. Chacklan management represented to Howarter the existence of substantial buyers for the product by truckloads per week and that the investor monies would be replaced in the collateral funding account as the product was sold over the course of the '84–'85 season.

29. Howarter testified that during the August, 1984 discussions with Chacklan management and others, the need for additional operating capital became apparent. Mr. Dellario no longer wanted to invest personally, but represented that he could place a $2 million loan with Mellon Bank with the personal guarantees of Howarter and Chacklan's two senior officers. Mr.

Dellario asked for $45,000 up front as advance points for the bank, and represented that the loan would fund around September 10 or 11, 1984. Howarter put up $25,000 of the $45,000 from his own funds.

30. In the meantime, Cooke called Howarter on August 12, 1984. Cooke testified he told Howarter that Cooke had started the process of obtaining a loan on his property to invest. Howarter testified he told Cooke it was not a good time to invest in Chacklan, and Cooke corroborates that statement. Cooke did not ask why, and Howarter did not explain.

31. Just 12 days later, Cooke called Howarter again. On August 24, 1984 Cooke told him that he had the money to invest in Chacklan and wanted to set up an appointment to bring it in. An appointment was set for August 30. During the brief conversation Howarter made a statement to the effect that if Cooke's loan was secured by his personal residence in order to invest in Chacklan, he shouldn't do it, but since it was a rental property that was different. Cooke did not ask why there was a difference.

32. In the meantime, and unknown to Howarter, Cooke had called Taddeo on August 16. Cooke told Taddeo he was about to obtain the loan proceeds and inquired whether he should obtain the investment forms from Taddeo or Howarter. Cooke inquired how the Chacklan investment was doing. Taddeo told him that no investor payments had been received from Chacklan in August and that $5.5 million in investor funds had been removed from the collateral funding account and taken into Mexico, with nothing left in the bank. Taddeo told him that Chacklan was working on obtaining a letter of credit from Mellon Bank, and that there were receipts evidencing the monies in Mexico. Taddeo told Cooke that while there had been some problems and were some to work out he was persuaded the investment was okay, and that Taddeo had little doubt about it. Cooke asked how the investor funds would be brought back from Mexico. Taddeo explained the process to Cooke and told him it would take the whole shrimp season to get it all back.

Taddeo did not tell Cooke about Chacklan's bad check in May, or that Chacklan's last payment to Howarter had been on June 24, although he knew about both.

33. On August 30, 1984 Cooke appeared at Howarter's office. Cooke did not inquire whether the time to invest was better than on August 12, and Howarter did not say anything about it. Howarter gave Cooke a copy of the prospectus at the meeting and Cooke testified he read it, but asked no questions about its contents. Cooke testified that Howarter told him about the spoilage and liability insurance; that Chacklan was working on a government project which would make the business bigger when it went through but would require investors to accept 25% less yield on their investments; and that a line of credit of $1.7 million would be in place in 7–10 days. Cooke testified that he believes Howarter told him that investor funds would be deposited in a bank and used as collateral. Cooke also asserts that Howarter told him that Chacklan was a very successful and lucrative business.

34. At the meeting on August 30, 1984 Cooke signed an investment agreement specifying that he was investing $30,000 at 4% interest per month. The agreement was annotated by Howarter in Cooke's presence to provide that the 4% was guaranteed for one month and could be reduced with 30 days advance notice. Another notation provided: "The $30,000 investment is in replacement of Lanny Howarter's personal funds previously invested."

35. Howarter deposited Cooke's check for $30,000 in Howarter's account and thereafter drew down the account over succeeding weeks to pay his own obligations. Howarter's view was that the $30,000 was his the same as if he had formally withdrawn $30,000 of his own investment and replaced it with Cooke's. It is clear, however, that Howarter could not have followed that procedure because there were no funds in the collateral funding account to apply for, and that Howarter knew that.

36. Howarter was experiencing cash flow problems, in part from personally funding the investor returns in June, July and August for his own investors, and in part from providing $25,000 to Dellario as advance points for the Mellon Bank loan that ultimately never went through. On August 28, 1984 Howarter received the proceeds of a $25,000 personal loan from his bank.

37. On September 19, 1984 Howarter took steps to have his personal residence homesteaded.

38. On September 20, 1984 Howarter wrote a letter to his investors advising them of an investor meeting to be held to discuss the problems with the Chacklan investment.

39. Chacklan Enterprises, Inc. subsequently collapsed and was put into bankruptcy. Cooke incurred costs of his $30,000 loan totalling $13,160.35 which included $11,463.35 in interest, $150 for appraisal, $200 in escrow fees, $247 title fees, and $50 each for reconveyance and forwarding fees.

Plaintiff Cooke contends that Howarter made the following representations at the specified times:

A. First phone conversation between Cooke and Howarter:

1. "That Howarter had thoroughly researched C.E., Inc. and its principals with positive results.

2. That, with respect to the investment program, certain protections were in place which greatly minimized the otherwise high risked [sic] nature of the investment, including:

(i) That the product was insured against any and all possible losses, foliage [sic], theft or damage, including products liability, up to $1,000,000.00;

(ii) A surety or fidelity bond was in effect to cover such things as embezzlement by the principals and/or agents of C.E., Inc., and

(iii) The "collateral funding account".

3. That the investment program had been highly successful and very lucrative; and

4. That C.E., Inc. was working on a government contract which was much

larger than any contract he [sic] was presently in.

B. Meeting on August 30, 1984:

1. That investment funds were being loaned to C.E., Inc. which deposited these funds in a corporate of [sic] certificate of deposit account;

2. That said corporate certificate of deposit account was being used only as security for a line of credit which line of credit was to be used for the purchase of products;

3. That Howarter had thoroughly researched the operations of C.E., Inc., and officers so as to insure maximum safety and security of the investment;

4. That certain economic safeguards were in place, such as insurance to cover product loss and surety bonds to cover embezzlement and alike, which insured maximum safety and security;

5. That C.E., Inc. had been extremely successful in the past and that all current indications were that it would continue to succeed in the future;

6. That Howarter, on behalf of himself and other investors, had invested only about $900,000.00 with C.E., Inc., previously;

7. That this investment offered high yields and short term liquidity without subjecting the principal investment to speculative or excessive risk;

8. That on or about August 30, 1984, the C.E. Investment program was full and that to enable COOKE to then participate, HOWARTER would accept COOKE's funds as a partial replacement of personal funds previously invested by HOWARTER;

9. That, accordingly HOWARTER would consider this a 'personal loan' from COOKE with a corresponding personal commitment to guarantee repayment of the same; and

10. That HOWARTER was financially substantial enough to guarantee the repayment."

Pretrial Order.

The Court finds that plaintiff Cooke has failed to carry his burden of establishing by clear and convincing evidence that rep-

resentation A(1), A(3) or A(4) were made during Cooke's first phone conversation with Howarter. Representations A(1) and A(3) likely involve information provided to Cooke by Mr. Taddeo. Representation A(4) may have been made at the August 30 meeting, but Cooke has failed to establish that it was false or known by Howarter to be false when made, whether in late July or on August 30.

Representation A(2) may have been made during the first telephone call, but Cooke has failed to establish that A(2)(i) and (ii) were false or known to Howarter to be false either then or later on August 30. Cooke testified during trial that in his first contact with Howarter, Howarter "may not have said anything about" the collateral funding account.

Accordingly, the Court finds that plaintiff Cooke has failed to establish any actionable misrepresentation by Howarter during the first conversation, which the Court has found occurred in late July.

In the pretrial order, which controls the pleadings in the case, Cooke does not contend any false representations were made by Howarter during the August 12 or 24 phone conversations. However, during his testimony Cooke stated that Howarter told him on August 12 that Chacklan was working on getting a government contract. There is no showing that the statement was false, known to be false, or was relied upon.

August 30, 1984 is the critical date in the transaction between Cooke and Howarter. It was their only face-to-face meeting about the investment. It was the date Cooke tendered $30,000 to Howarter. The meeting was also four years ago, and the recollections of the participants are understandably less than precise. What is agreed upon is that Howarter provided Cooke with a copy of the prospectus, Exhibit 8, and that Cooke read it. Cooke also advised that he asked Howarter no questions about its contents.

The Court finds that the substance of representation B(1) was made to Cooke by Howarter on August 30 by providing Cooke

with the prospectus, the first page of which indicates that investor funds would be placed in Chacklan's savings account. There is insufficient evidence to establish that Howarter orally made any representation to Cooke on August 30 that investor funds would be used "only" as collateral for short term loans to Chacklan. The prospectus does not make such a representation in writing, either (see Exhibit 8). Accordingly, the Court finds that Cooke has failed to establish the essence of representation B(2).

Representations B(3), B(4), and B(7) were made to Cooke by Howarter in substantial part through the written prospectus. Howarter does not deny that he may have mentioned the surety bond to Cooke, as Cooke has testified he did. However, no sufficient evidence has been adduced to establish that any element of each of the representations was false, much less that they were known to Howarter to be false when made.

There is no clear and convincing evidence which would permit the Court to conclude that Howarter made representation B(5) to Cooke. Moreover, while such a statement would not have been out of place, the evidence before the Court indicates Howarter believed it to be true. The investment had done well through Spring, 1984, then ran into the seasonal slowdown. While Howarter was concerned when he learned investor funds had been withdrawn and taken to Mexico, he was mollified by production of receipts for the monies, and was encouraged about the future with the prospect of new operating capital from Mellon Bank. Accordingly, had Howarter made such a representation, the Court could not, on the present record, find that it was knowingly false or made in reckless disregard of the truth.

Representation B(6) allegedly was that investors only had invested approximately $900,000 in Chacklan. The statement appears to reflect a misunderstanding, for Howarter had personally invested approximately that amount, independent of other investors. In any event, Cooke has not established why that alleged representation was important, or that he relied upon it.

The facts adduced at trial established that Howarter accepted Cooke's $30,000 as replacement money for the same amount of Howarter's own investment, the same as if Howarter actually withdrew $30,000 of his investment (although Howarter knew on August 30 that there was no cash in the Chacklan bank account which he could request withdrawn). Cooke knew he was buying out a piece of Howarter's investment, as the notation on Exhibit 19 expressly recites. Whether Howarter told Cooke the investment was "full" is not particularly relevant because there is no showing that Cooke's funds would have survived the prompt collapse of Chacklan, assuming Cooke's funds had gone into Chacklan's account instead of Howarter's.

Lastly, the Court finds there is no sufficient evidence to support a finding that either representation B(9) or B(10) were made. Moreover, the substance of B(9) is impeached by the notation on Exhibit 19. And, B(10) would not be actionable under the express language of § 523(a)(2)(A) because it purports to be a statement concerning the debtor's financial condition.

Accordingly, the Court concludes that none of the affirmative representations purportedly made by Howarter to Cooke are a basis for finding Howarter's debt to Cooke nondischargeable. However, that conclusion does not end the Court's inquiry.

██ In appropriate circumstances, material omissions can constitute false representations. See e.g., *In re Piccolomini*, 87 B.R. 385, 387 (Bankr.W.D.Pa.1988). This case presents such circumstances. On August 30, 1984, at the time he met with Cooke, Howarter knew that approximately $7.1 million had been withdrawn from the collateral funding account and taken into Mexico. Howarter testified that up to that point in time he had not understood that Chacklan could touch the funds in the account for that purpose. Howarter knew that it would take most of a year for those funds to be returned. Howarter knew that Chacklan had not made payments to his investors since June 24 and that Chacklan

was in arrears on payments due before that. All of that information is material to a prospective investor's decision on whether to invest. The question then becomes whether Howarter told Cooke about the foregoing.

Cooke testified that on August 30 Howarter told him that a line of credit for $1.7 million would be in place for the Chacklan operation in 7–10 days. Further, Howarter told him that Chacklan was working on a government project which would make the business bigger. However, Cooke insists Howarter did not tell him about the investor funds being withdrawn, the non-payment of investor earnings, that Howarter was personally keeping his investors current despite Chacklan's default, or that the collateral funding account was purportedly in the process of being reinstated. Howarter did not testify that he did disclose that information to Cooke.

In the Court's view, an even more compelling argument in favor of Howarter's duty to disclose to Cooke the true circumstances regarding the Chacklan investment focuses on the Mellon Bank loan. Howarter testified that the true state of affairs with Chacklan started to be revealed around the time a possible new investor insisted on audited financial statements for Chacklan. Subsequent meetings between that potential investor Dellario, Chacklan officials, and Howarter, culminated in a decision by Dellario not to personally invest. However, Dellario represented that he could place a $2 million loan for them with Mellon Bank in a matter of one-two weeks. In order to do so, Dellario asked for $45,000 as advance points on the loan. Howarter personally put up $25,000 of the $45,000 provided to Dellario. Those facts corroborate that Chacklan had no current operating funds, and needed to borrow to keep going. Howarter testified that he understood that new operating funds were needed because as the loads of shrimp came north from Mexico, payments would be made in part by new money and in part from the monies already paid into Mexico from the collateral funding account. From the evidence adduced at trial, the Court finds that Howarter disclosed the impending loan, but did not reveal the circumstances which made the loan necessary.

■ The Court finds that omission of those material facts constituted misrepresentations by Howarter because he had a duty to disclose that information after having presented Cooke with a copy of the prospectus. The prospectus, while not directly false, was misleading in the light of the actual circumstances known to Howarter on August 30.

The conclusion that Howarter did make misrepresentations in turn focuses the next inquiry on whether Cooke relied on those misrepresentations. There is a substantial basis for concluding that he did not.

Mr. Taddeo's testimony is critical on the question of Cooke's reliance. Mr. Taddeo testified that Cooke called him on August 16. Cooke advised that he was about to receive the proceeds of the loan and asked how the Chacklan investment was doing. Mr. Taddeo told Cooke that investors had received no payments in August from Chacklan. Cooke was told that the investor funds had gone to Mexico and that there were no investor funds left in the bank. Mr. Taddeo testified that he told Cooke that after conversations with Howarter, learning of the receipts and the proposed loan from Mellon Bank, that he (Taddeo) was persuaded the investment was still okay; there were problems to work out but he had little doubt about the investment. According to Mr. Taddeo, Cooke asked him how Chacklan was going to get the money back from Mexico. Cooke was told it would take a whole shrimp season to do it.

Prior to hearing Mr. Taddeo's testimony, Cooke denied having been told by Mr. Taddeo that anything was amiss with the Chacklan investment. The Court finds Mr. Taddeo's testimony to be the more credible, both because of the circumstances and substance, and because Mr. Taddeo produced at trial notes he contemporaneously made of his several conversations with Cooke, including the telephone conversation on August 16.

Notwithstanding having been given specific information concerning problems with the Chacklan investment, Cooke claims to have relied on the terms of the prospectus outlining the collateral funding account. Courts have recognized that a creditor's claimed reliance may be "so unreasonable as to be no reliance at all." *In re Weiner*, 86 B.R. 912, 915 (Bankr.N.D.Ohio 1988). Cooke apparently raised no questions about what he had been told, as contrasted with the terms of the "prospectus", particularly inasmuch as the terms of the "prospectus" provided by Howarter were presumably the same as those shown to Cooke by Mr. Taddeo in March. Because Howarter's misrepresentation is a combination of the presentation of the "prospectus" and the failure to disclose known facts, making the "prospectus" misleading, it is difficult to conclude whether Cooke in fact relied on the assumed non-existence of the undisclosed facts. At the same time, had Howarter told Cooke all the relevant facts, it is unlikely that Cooke would have turned over his funds. To that extent, at least, the Court must find that Cooke relied upon Howarter's misrepresentation.

Having determined that Howarter did make misrepresentations to Cooke, and that Cooke relied on those representations, the Court next must determine whether reasonableness of that reliance is an element of an objection to discharge under 11 U.S.C. § 523(a)(2)(A). If it is not an element, then plaintiff Cooke prevails. If reasonableness of reliance is an element, then the Court must proceed to determine whether Cooke's reliance was reasonable.

At the request of the Court, the parties have thoroughly briefed the issue of reasonableness of reliance as an element under § 523(a)(2)(A). Both sides have presented cogent and supported arguments in favor of their respective positions.

Initial analysis necessarily focuses on whether there is a controlling decision issued by the Supreme Court or the Ninth Circuit Court of Appeals. No decision of the Supreme Court has been cited by the parties or found by the Court which is relevant. Cooke points out that the Ninth Circuit Court of Appeals defined the elements of a misrepresentation claim under § 523(a)(2)(A) in *In re Houtman*, 568 F.2d 651 (1978). That decision requires that "the creditor relied on such representation ...," *Id.* at 655, but is silent on whether reliance must be reasonable, as Cooke correctly notes.

Howarter has pointed to *In re Kisich*, 28 B.R. 401 (9th Cir.B.A.P.1983), and argues that it is a controlling decision. The facts as recited establish that the essence of the claim at issue in *Kisich* involved oral misrepresentations, in part by omission, and therefore were brought under § 523(a)(2)(A). Relevant to the present inquiry, during its discussion, the *Kisich* court stated:

Section 523(a)(2) requires, in addition to proof of intentional fraud, that the creditor reasonably relied on the misrepresentation.

28 B.R. at 403. The court then wrote:
The Lamberts did not rely on the representations of the debtors regarding title but rather on the conclusions of the appellant after it conducted a title search. Furthermore, it is patently unreasonable for the appellant to have relied on the debtors' representations since the very essence of a title insurer's function is to ascertain the state of the title to property.

Id.

After a careful review of the *Kisich* decision, this Court concludes that on its facts *Kisich* is a "no-reliance" case. The court's statement that a creditor must reasonably rely on the misrepresentation is not attributed to any source and, because the case is a "no-reliance" case, the statement must be considered dictum. Moreover, the *Kisich* court never focused on any distinctions between § 523(a)(2)(A) and (a)(2)(B), or on any difference in the elements under each, and was not called upon to resolve the issue which now confronts this Court.

Another decision to consider is *In re Haddad*, 21 B.R. 421 (9th Cir.B.A.P.1982). That case involved an "unspoken representation by Anderson, adopted by Tom's [debtor's] silence ..." 21 B.R. at 423. The

court there found that the debtor had a duty to disclose information known to him at the time of the "unspoken representation". After finding that the creditor had relied on the implied representation, the court wrote:

> The debtor knowingly and willfully concealed from Caroline the existence of $1,500,000 in cash or equivalent, approximately $1,000,000 of which belonged to GHP, to induce her to pay $250,000 plus interest on a GHP liability for which she was only secondarily liable. Caroline reasonably relied and has been damaged. The liability is not dischargeable under 11 U.S.C. § 523(a)(1) [sic].

21 B.R. at 424. The Bankruptcy Appellate Panel reversed the bankruptcy court finding of dischargeability and remanded for entry of judgment of non-dischargeability on § 523(a)(2)(A) grounds. There was even less discussion of elements in *Haddad* than there was in *Kisich*. Moreover, in *Haddad* the focal issue was whether the "unspoken representation" was a misrepresentation within the scope of § 523(a)(2)(A), rather than reliance.

The controversy over whether reasonableness of reliance is an element of a misrepresentation claim under § 523(a)(2)(A) is clearly framed by the conflicting decisions of *In re Ophaug*, 827 F.2d 340 (8th Cir.1987) and *In re Mullet*, 817 F.2d 677 (10th Cir.1987). In *Ophaug*, the Eighth Circuit concluded that only actual reliance was required. In reaching its holding, the court relied on accepted canons of statutory construction and observed that the Congress had expressly added a requirement of reasonable reliance to § 523(a)(2)(B) while omitting it from (a)(2)(A).

The Tenth Circuit went the other way in *Mullet*. In that case, the bankruptcy court and district court had found the debt dischargeable under § 523(a)(2)(A) because the creditor's purported reliance on the alleged misrepresentations was unreasonable. The Tenth Circuit observed:

> Section 523(a)(2) is the successor to § 17(a)(2) of the Bankruptcy Act, 11 U.S. C. § 35(a)(2), and it only slightly modified

§ 17(a)(2). S.Rep. No. 95–989, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5864. "Cases interpreting section 17(a)(2) developed two judicial glosses. First, because direct proof of actual reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance. Second, actual reliance must be reasonable." *In re Kreps*, 700 F.2d 372, 375 (7th Cir.1983) (citations omitted).

817 F.2d at 679. The court then stated:

> We conclude that this standard of reasonableness required under § 17(a)(2) should continue to be imposed on claimed reliance pertaining to § 523(a)(2)(A).

Unfortunately, *Mullet* predated *Ophaug* and does not discuss the Eighth Circuit's rationale.

The Seventh Circuit has also held that reliance must be reasonable under § 523(a)(2)(A). The court, in *In re Kimzey*, 761 F.2d 421, 423 (1985) upheld a bankruptcy court and district court finding of non-dischargeability on the ground that the creditor reasonably relied on the representation.

The Eleventh Circuit, in *In re Hunter*, 780 F.2d 1577 (1986) recited that reliance must be reasonable, but found no misrepresentations had been made, so did not reach the question of reliance, much less reasonableness.

At least two Bankruptcy Courts have attempted to reconcile the conflict between the *Ophaug* and the *Mullet/Kimzey* camps. The court in *In re Showalter*, 86 B.R. 877 (Bankr.W.D.Va.1988) concluded that whether reasonableness of reliance was an element under § 523(a)(2)(A) depended upon whether the questioned transaction arose in a commercial context or in a non-commercial or friendship-type relationship. The *Showalter* court would require only reliance in the latter context. 86 B.R. at 881.

In *In re Paolino*, 89 B.R. 453 (Bankr.E. D.Pa.1988), the court found the Tenth Circuit's reasoning in *Mullet* persuasive. In addition, the court noted that reasonableness of reliance has traditionally been an element of common law fraud causes of action. The court recognized the anomaly

that would exist if a creditor could not obtain a judgment for fraud under state law because unable to prove reasonableness, but the same creditor could prevail in bankruptcy court on a non-dischargeability claim because reasonableness was not an element.

■ After full consideration, this Court concludes that reasonableness of reliance is an element which must be established to render a debt non-dischargeable under § 523(a)(2)(A).

The reasoning of *Mullet* and *Paolino* is persuasive. In addition, it would make little sense to hold that a creditor may unreasonably rely on an oral representation of a debtor, as difficult as it often is to prove such a representation, and have the debt declared non-dischargeable, while the creditor who relies on a false written financial statement must establish the reasonableness of its reliance to achieve the same result. It is no answer to assert that the bankruptcy system is not intended to be a shelter for dishonest debtors, for a debtor who knowingly prepares a false written financial statement is often at least as dishonest as the debtor who obtains money or property through false representations.

The rationale of the Eighth Circuit in *Ophaug* would be easier to sustain if the Congress had been writing on a clean slate when enacting § 523(a)(2). However, that was clearly not the case. The statute which preceded § 523(a)(2)(A) was 11 U.S. C. § 35(a)(2). That subsection excepted from discharge debts which:

> (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another.

The *Mullet* court noted that in adopting § 523(a)(2) the Congress was only slightly modifying § 35(a)(2). Basically, the Congress reorganized the parts of § 35(a)(2) into § 523(a)(2)(A), (a)(2)(B), and (a)(6). What is relevant to the present analysis is that false pretenses and false representations were common law causes of action, each with established elements. Neither § 35(a)(2) nor the present § 523(a)(2)(A) attempted to define those elements. And, as the *Paolino* court observed, reasonableness of reliance was traditionally an element. 89 B.R. at 462. See *Carini v. Matera*, 592 F.2d 378, 381 (7th Cir.1979).

The provision in § 35(a)(2) regarding use of "a materially false statement in writing respecting his financial condition ..." was a special subset of a fraud-type claim which the Congress chose to separately state, and for it the Congress specified the elements, including (1) materiality; (2) falsity; (3) in writing; (4) statement concerns financial condition; (5) "made or published ... with intent to deceive"; and (6) reliance.

In reorganizing § 35(a)(2) into the present § 523(a)(2), the Congress changed very little of the foregoing. The Congress put into (a)(2)(A) the false pretenses and false representations causes, and added actual fraud, another traditional common law claim. Just as in § 35(a)(2), the Congress did not set out the respective elements of causes of action for false pretenses, false representations or actual fraud. The elements of those causes were already well established. The Congress put into (a)(2)(B) the same cause and elements previously set out in § 35(a)(2), and added the judicially established element of reasonableness. The Congress was not changing the law as it had been defined by the courts.

A traditional canon of statutory construction is that the Congress is presumed to know the state of the law at the time it acts and repeal of prior decisional law is not to be inferred absent a clear expression of congressional intent. Reasonableness of reliance was a recognized element of a non-dischargeability claim based on false representations prior to enactment of § 523(a)(2). There is nothing in § 523(a)(2)(A) itself, or in its legislative history, to indicate that the Congress intended

to delete reasonableness of reliance as an element. See, *e.g., United Savings Association v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988).

The last issue, then, is whether Cooke's reliance was reasonable under the circumstances. The Court has considered whether an experienced investor such as Cooke would have asked Howarter why a $1.7 million line of credit was needed. A reasonable investor may have asked how the line of credit was collateralized, also. A reasonable investor probably would have asked Howarter why he had said on August 12 that it was not a good time to invest in Chacklan. Moreover, if Cooke believed that investor funds were not touchable in the collateral fund account, one might expect him to ask Howarter why there was a difference between taking a second loan on his personal residence versus a rental property. There is no evidence that Cooke asked any such questions. However, the failure to ask those questions is not enough to make Cooke's reliance unreasonable.

The Court has already discussed the importance of Mr. Taddeo's testimony in connection with Cooke's claimed reliance. That discussion is equally applicable here. In light of what Mr. Taddeo told Cooke in August, just two weeks before Cooke's meeting with Howarter, the Court finds that Cooke could not have reasonably relied on Howarter's misrepresentations. Armed with Mr. Taddeo's information, Cooke had a duty to attempt to reconcile whatever Howarter may have represented with what Cooke had already learned.

Accordingly, for all the foregoing reasons, the Court finds that Cooke has failed to meet his burden in establishing that the debt owed to him by Howarter is non-dischargeable under 11 U.S.C. § 523.

This memorandum decision constitutes findings of fact in accordance with Bankruptcy Rule 7052. Counsel for defendant Howarter is to lodge with the Court a separate judgment in accordance with Bankruptcy Rule 9021 within fifteen (15) days of the date of filing of this decision.